MARIEA GROLA *et al.*, Plaintiffs in Error, *vs.* THE INDUSTRIAL COMMISSION *et al.*—(MT. OLIVE & STAUNTON COAL COMPANY, Defendant in Error.)

*Opinion filed Sept. 19, 1944—Rehearing denied Nov. 16, 1944.*

C. C. DREMAN, of Belleville, for plaintiffs in error.

MEYER & MEYER, of East St. Louis, for defendant in error.

Mr. JUSTICE WILSON delivered the opinion of the court:

As widow and son, respectively, Mariea Grola, and Enrico Grola by his next friend, filed with the Industrial Commission an application for adjustment of claim against the Mt. Olive & Staunton Coal Company alleging the death, February 4, 1942, of Angelo Grola, as the result of an accidental injury arising out of and in the course of his employment in the company's mine No. 2, at Williamson. An arbitrator awarded compensation. Upon review, the Industrial Commission set aside the arbitrator's award, finding (1) that Grola did not sustain an accidental injury arising out of and in the course of his employment and (2) that his death was not the result of an accidental injury. The circuit court of Madison county confirmed the

decision of the commission. We have allowed a writ of error for a further review of the record.

The sole question requiring consideration is whether the decision of the Industrial Commission that Angelo Grola's death was not caused by an accidental injury, arising out of and in the course of his employment, is against the manifest weight of the evidence. Determination of this issue necessitates a review of the relevant testimony. Grola, for some years, had been employed by the Mt. Olive & Staunton Coal Company as a "clean-up" man on the night shift. His duties consisted of cleaning up after coal had been blasted and loaded into cars by miners. The night shift regularly commenced work at the "face," or scene of operations at the mine, at 3:40 o'clock P. M. According to the undisputed evidence, Grola had never been ill, and felt well on February 4, 1942, when he left his residence after his noonday meal. He arrived at the mine, as usual, about 2:30 o'clock P. M. Upon reporting, an employee is given his "live check," a piece of metal containing a number, which he places in a bucket at the top of the mine. The bucket is brought down with the last man reporting for work, when the checks are hung on a board. The presence below of the men represented by the checks is thus indicated. Upon arriving at the bottom of the shaft, the men await orders. A mine car on a "man trip," conveys the men to their places of duty. The man trip is assembled at a location about 450 to 500 feet directly north from the bottom of the elevator shaft, this distance being negotiated by walking. On the day in question, Grola descended to the working level and, with two other employees, was seated on a bench about fifty feet north of the elevator shaft. About five minutes after three o'clock, he left the bench and walked north in the direction of the man trip assembly point. He was not thereafter seen alive. He did not report at the man trip to be transported to the place where he was to perform his duties. On the board,

however, was his live check, located the next day, when his family reported that he had not returned home the previous night. An investigation then instituted disclosed his clean clothes still in his locker. His body was found about three o'clock P. M., February 5, 1942, in the part of the mine described as the "first left north entry," located approximately 300 feet north of the elevator shaft and about 150 to 200 feet west. This entry consisted of an abandoned place, used prior to Grola's death, among other purposes, for storing dynamite. At the rear of the entry, fifty-five feet distant from a track passing its entrance, was a brick wall, installed in 1928, sealing operations in this section. About twenty-five feet inside the entry, a two-board wooden barricade was erected, bearing, in chalk printing, on each board, the legend, "Keep out." Another chalk-printed sign, located nearby, contained a warning not to use the area for toilet purposes. Grola's body was found closely adjacent to the brick wall constituting the seal, lying on its right side, his face next to the wall. His knees were crossed. All his clothes were buttoned.

Steve Bartony, a coal miner, with whom Grola and another employee were seated awaiting orders, was asked if Grola said anything upon his departure from the bench. An objection was sustained by the arbitrator upon the ground that no one representing the employer was present at the time. An offer of proof by the claimants, objection to which was also sustained, tended to show Grola stated his purpose in leaving the bench was in response to a call of nature. This testimony and offer of proof was clearly admissible as a part of the *res gestae,* conformably to the rule that statements by a deceased person, made at the time of his departure, with reference to his destination, may be proved where the statement is immediately connected with the act of departure. (*Boyer Chemical Laboratory Co.* v. *Industrial Com.* 366 Ill. 635.) A blueprint plat introduced in evidence shows regular latrines in a location about 270

feet south of the shaft. Dr. Edward F. Sullivan, who examined the body on February 5, testified to finding an abrasion on Grola's forehead and a laceration of the left side of his head. He expressed no opinion as to the cause or time of death.

Testimony as to conditions experienced by a State mine inspector and by various employees during the search for Grola's body February 5, and later the same day, tended to show, in the first left north entry, the presence of black damp, characterized as absence of oxygen, in sufficient quantity to affect and extinguish carbide lights carried by them. According to the inspector, black damp is heavier than air and drifts to low places, and is more likely to be found in a ditch, such as the one existing alongside and extending the entire width of the brick wall, or seal, near which Grola's body was found. He also testified that when atmospheric oxygen content is reduced to ten per cent or less, very great danger to life exists. Chris Calderaro, a "rock shooter" at the mine, testified that his duties required the use of powder, obtained at the beginning of each day's work from a storage box located fifteen or twenty feet inside the first left north entry; that his carbide light invariably became extinguished as he proceeded into the entry, necessitating negotiation of the distance to the powder box in the dark, and that he reported this phenomenon to the mine manager's office four or five months prior to Grola's death. Testimony of employees of long experience in the mine also tended to show the nonexistence of a barricade in the first left north entry, and their unfamiliarity with the existence and location of regular latrines for toilet purposes. There is also testimony as to a custom, particularly with respect to night-shift employees, whereby wide latitude was exercised in the choice of places other than latrines for toilet purposes. One witness testified "any place" will do. On the other hand, testimony of witnesses for the employer indicated that upon entering

the first left north entry in search of Grola's body no particular difficulty was experienced with carbide lamps and that these lamps did not become extinguished. Sidney Smith, mine manager, denied that Calderaro reported to his office the presence of black damp in the entry. Smith also testified to the erection of latrines and a barricade long prior to February 4, adding that a photograph of the barricade, introduced in evidence, was taken after dust had been blown off the sign to make it clear. Although existence of a custom of promiscuous use of places other than latrines for toilet purposes was denied by witnesses on behalf of the employer, Glenn Phillips, night mine boss, conceded that it was customary for men inside the mine to use other places than latrines, and that, in all probability, the first left north entry had previously been so used, accounting for the presence of a sign in this entry warning against its use for such purpose.

Norman Chapman, a mine foreman, testified he was on the night shift February 4, his duties being to check the men at the man trip and to prepare the coal; that before departure of the man trip he determines if all men of his gang are present, but that no record is then made of the employees actually making the trip. He further testified that Grola was scheduled to work under him on February 4 as a clean-up man; that, about 3:15 o'clock P. M., he checked at the man trip and that Grola was not there. Phillips testified to a report received by him from Chapman, about 3:15 o'clock P. M., that Grola was not working, that he then had to replace Grola, and that he did not investigate the latter's absence until the next day, when informed by the mine superintendent of Grola's failure to return home the previous night. Smith stated that Grola's employment as clean-up man normally required his presence in the southeastern portion of the mine, about three and one-half miles distant from the hoisting shaft; that no part of Grola's duties required his presence in the first

left north entry, and that to reach his appointed tasks it was unnecessary for Grola to pass the entry where his body was found.

An "accidental injury" is one which occurs in the course of employment, unexpectedly and without the affirmative act or design of the employee, traceable to a definite time, place and cause. (*Fittro* v. *Industrial Com.* 377 Ill. 532.) Grola, according to the evidence, enjoyed good health, and evidence indicating any thought on his part of self-destruction is wanting. Moreover, the presumption is against suicide, and such presumption will prevail in the absence of evidence tending to rebut it. (*Consumers Co.* v. *Industrial Com.* 364 Ill. 145; *Ervin* v. *Industrial Com.* 364 Ill. 56.) The cause of death need not be shown by positive and direct testimony, but it is sufficiently shown if the facts and circumstances proved are such that, upon the whole evidence, the reasonable inference to be drawn is that it arose out of and in the course of the employment. (*Smith-Lohr Coal Mining Co.* v. *Industrial Com.* 286 Ill. 34.) Applying these principles to the testimony recounted, the conclusion necessarily follows that Grola's death occurred because of the presence in the first left north entry of black damp, a lethal agency characterized as atmospheric oxygen deficiency. As contended by claimants, no other satisfactory explanation of his demise is advanced, and, under the peculiar circumstances here present, the proof adduced is sufficient to satisfy the prerequisite of an accidental injury.

To be entitled to recover, the claimants must show, in addition, however, that the injury and consequent death arose "out of" and "in the course of his employment." There is no fixed rule for determining these phases of required proof, each case depending upon its own facts and circumstances. (*Scott* v. *Industrial Com.* 374 Ill. 225; *Borgeson* v. *Industrial Com.* 368 Ill. 188.) To be compensable on the ground of arising out of and in the course

of employment, an injury causing death must have arisen while the employee was acting within the duties of his employment, or some act incidental thereto. In short, there must be a causal relation between the employment and the injury which caused the death. (*Lagomarcino-Grupe. Co.* v. *Industrial Com.* 383 Ill. 95; *Farley* v. *Industrial Com.* 378 Ill. 234; *Connor Co.* v. *Industrial Com.* 374 Ill. 105.) Proof of the necessary facts to establish liability of an employer need not necessarily be by direct evidence, but may be deduced circumstantially, where, as here, there were no eyewitnesses. *Armour & Co.* v. *Industrial Com.* 367 Ill. 471; *Ervin* v. *Industrial Com.* 364 Ill. 56.

Considerable stress is placed upon the finding of Grola's body in the first left north entry, located 150 to 200 feet west of the ordinary route of travel used by employees to reach the man trip, the presence of a barricade and warning signs forbidding access to and discouraging use of this entry for toilet purposes and the existence of regular latrines south of the elevator shaft for employees' use. It is urged that there was an absolute failure to meet the burden cast upon claimants of showing Grola's death resulted from an accidental injury arising out of and in the course of his employment since Grola deliberately went to a location known by him to be dangerous, on a mission clearly outside the performance of any duties imposed upon him by his employer. Although a custom, testified to by several employees, as to wide latitude exercised by members of the night shift in the selection of toilet facilities was denied by some of the mine officials, it sufficiently appears from the testimony of Phillips, night mine boss, that, inside the mine, places other than latrines were utilized, with the knowledge of the management, and that, moreover, the erection of a cautionary sign in the first left north entry was to discourage use of the entry for this very purpose. Existence of the custom being conceded, Grola's claimed deviation from the regular route to the

man trip is adequately explained. An employee, while engaged in the work of his employer, may do those things which are necessary to his health and comfort, even though they are personal to himself, and such acts will be considered incidental to the employment. (*Porter* v. *Industrial Com.* 352 Ill. 392.) Authorities cited by the employer with respect to injuries sustained where an employee incurs a risk of his own choosing, beyond any reasonable requirement of his employment, are inapplicable. Here, although the first left north entry was used as a storage place for dynamite, no claim of injury owing to this use is advanced. The death of Grola was not brought about because of the storage of dynamite in this particular place. Furthermore, the mere presence in the entry of black damp, without some showing of previous knowledge upon Grola's part of this latent danger, is insufficient to warrant characterization of the entry as a dangerous agency on this account. Although regular latrines were shown to have been installed south of the shaft, several employees of long standing testified to unfamiliarity with their location. The record is barren of any general or specific notice to employees, or Grola in particular, not to use the entry for this purpose. Again, the testimony of Smith as to the necessity of removing dust from warning signs to obtain a clear photograph suggests obliteration, to Grola's vision, of chalk-printing on these signs owing to the presence of coal dust. This conclusion is fortified by the testimony of various employees' claimed lack of knowledge of the existence of the barricade. Notwithstanding Grola's apparent deviation from a regular route of travel, he did not at any time depart from the premises of his employer. If capable of any purposeful meaning, the practice of depositing, and posting on a board, of employees' live checks, warranted further inquiry upon failure to report of an employee whose check is thus deposited and posted, and, if necessary, a search, which at the time should have readily

disclosed Grola's whereabouts. A reasonable deduction from the competent evidence is that, at the time of his death, Grola was engaged in a mission clearly incidental to, and having a causal relation with, his employment.

The rule is well settled that this court does not reverse findings of the Industrial Commission unless manifestly against the weight of the evidence. (*Mandel Bros. Inc.* v. *Industrial Com.* 359 Ill. 405; *Allith-Prouty Co.* v. *Industrial Com.* 352 Ill. 78.) It is our duty, however, to weigh and consider the evidence in the record, and if the decision of the commission is without substantial foundation in the evidence, it must be set aside. (*Mirific Products Co.* v. *Industrial Com.* 356 Ill. 645.) Here, uncontroverted facts show (1) that the accident occurred on the premises of the employer; (2) that Grola had checked in and was subject to call; (3) that he was in good health just prior to the time of his death, and (4) that there were abrasions on his head and blood around his mouth when his body was found. The proof tended to establish an accidental death, thereby casting upon the employer the burden of showing otherwise. This, it failed to do. A consideration of the foregoing and other facts disclosed by the record impels the conclusion that the findings and decision of the Industrial Commission are manifestly against the weight of the evidence. Claimants established by competent evidence that an accidental injury occurred, that there was a causal connection between the injury and the death for which compensation was sought, and that the injury arose out of, and in the course of, Angelo Grola's employment.

The judgment of the circuit court of Madison county is reversed and the cause is remanded, with directions to set aside the findings and decision of the Industrial Commission and to enter an appropriate judgment in favor of claimants.

*Reversed and remanded, with directions.*