THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* WARREN DAVID REDDOCK, Defendant-Appellant.

(No. 72-38;

Second District—August 2, 1973.

Paul Bradley, of Defender Project, of Elgin, for appellant.

Jack Hoogasian, State's Attorney, of Waukegan, and James W. Jerz, of Model District State's Attorneys Office, of Elgin, (Dudley E. Owens, Assistant State's Attorney, of counsel,) for the People.

Mr. JUSTICE THOMAS J. MORAN delivered the opinion of the court:

After a bench trial, defendant, Warren David Reddock, was found guilty of murder and sentenced to serve thirty to fifty years in the state penitentiary. The indictment charged that he had killed Harvey Rosenzweig (sometimes referred to as the deceased) by a blow to the head with a blunt instrument. A chronological summary of the evidence follows.

Celia Rosenzweig, the deceased's sister, testified that deceased, a 40-year old accountant, lived with her, two other sisters and their mother in a home on Bryn Mawr Avenue in Chicago. In the summer of 1968, he drove to Canada for a vacation and, while in Montreal, responded to a newspaper ad relating to a business venture. He returned from this vacation sometime in the beginning of August 1968.

On August 12, 1968, one Donald A. Nichols checked into room 358 of the Mt. Prospect Holiday Inn. (Through the use of handwriting analysis, it was proven that the man purporting to be Donald A. Nichols was actually the defendant, Warren Reddock.)

On the same day, the deceased met and conferred with his attorney, Richard Kahn, who, as a result of this meeting, drew up an employment agreement between deceased and the European Arms Corporation. The attorney testified that, while in his office, deceased made a phone call and asked for a Mr. Reddock. Listening on an extension phone, Kahn heard a man answer; deceased addressed the man as Warren or Mr. Reddock and introduced him to Kahn by those names. The attorney spoke to the man and confirmed certain facts concerning the employment agreement: *i.e.*, that deceased would become the president of a corporation which would initially be engaged in the investment of land in Lake County, Illinois, and which would be partially funded by money coming from Canada.

On that day, also, Louis Behm, a real estate broker, received a telephone call from a man named Mr. Nichols who inquired into the advertised sale of 900 acres of wooded land in Lake County (hereinafter referred to as the Mud Lake property). On August 14, 1968, Nichols arrived at Behm's office and the two men drove out to inspect the property. Behm testified that the man told him that he was interested in an arms manufacturing company which would be financed by money coming from Canada, that a man by the name of Rosenzweig would run the operation and that Rosenzweig's attorney was a man named Kahn. After viewing the Mud Lake property, Nichols advised Behm that he wanted to show the property to his partner, that he would get in touch with

Behm at a later date, and that Behm could reach him at the Mt. Prospect Holiday Inn in room number 358. At trial, Behm identified the defendant Reddock as the man he had known as Nichols and the one to whom he had shown the Mud Lake property on August 14th.

Celia Rosenzweig testified that on the morning of August 16, 1968, the deceased prepared to take a trip. Over objection of defense counsel, she related a conversation she had with her brother, saying, "He said he was going to look at the land * * * and that Mr. Reddock would pick him up across the street on the corner * * *."

Later on the day of August 16th, two men came to see Behm at his Grayslake office but he was not in. Behm's employee identified the deceased as one of these men but could not identify the other. At 6:25 P.M. that day, the deceased registered at the Waukegan Motor Inn. Registering to share the room with deceased was one "W. Bradley." A handwriting analyst testified that the signature of "W. Bradley" indicated that the individual was, in fact, the defendant Warren Reddock. William Thompson, assistant manager of the Inn, testified that on an evening in the middle of August, 1968, in the restaurant of the Inn, he joined in a conversation between the deceased and another man and discussed real estate development in the general area; that on the following morning he observed the same men, casually dressed, and that the man accompanying the deceased carried a small tool chest. At the trial, Thompson identified the deceased from a photograph but upon being asked whether the man who he had seen with the deceased was in the courtroom Thompson identified a deputy sheriff. Over defense objections, Thompson was then called as a court's witness and, in answer to the court's questions, testified that he had been shown two photographs in October, 1971, that he had identified the subject of one as the deceased and the other (a picture of defendant) as the man who accompanied him.

On the morning of August 17, 1968, Celia Rosenzweig received a letter from the deceased, postmarked August 16, 1968, in McHenry, Illinois, in which he informed his sister that he would be leaving for Monaco and gave her an address and telephone number where he could be reached. Later that morning, Celia received a telephone call from her brother telling her, "Because of the downpour on Friday, he had not been able to go out and look at the land and so their plans would be changed and they would go to Monaco via Montreal." He was never seen alive nor heard from again after August 17.

On that date, a man purporting to be Harvey Rosenzweig checked into the O'Hare Travelodge Hotel. A handwriting analyst testified that the signature of Harvey Rosenzweig on the registration card was not written

by the deceased and that the printing of the address, city and state on the card was in fact executed by the defendant. On August 19, 22 and 27, checks were written on Harvey Rosenzweig's checking account; defendant's fingerprints were found on two of these checks and a handwriting analyst testified that the defendant had signed the name Harvey Rosenzweig on all of them. Beginning August 17, and through the month of September, the deceased's Carte Blanche credit card was used in New York, Hong Kong, Mexico, and Montreal. A handwriting analyst testified that the Harvey Rosenzweig signatures on the receipts had not been written by the deceased. Although there was no testimony that the signatures on these receipts had been written by defendant, his fingerprints were found on one of the receipts from Mexico, dated September 18.

On September 30, 1968, at a hotel in Jamaica, defendant conversed with Raymond Raedel, told Raedel that he was a surgeon at Mt. Sinai Hospital in Chicago and that he lived on Bryn Mawr Avenue in Chicago with his aunt and her daughter. When, on the following day, Raedel complimented defendant on the sport coat he wore, defendant informed Raedel that he had purchased it in Hong Kong and opened the jacket to show the Hong Kong label.

In September of 1968, concerned when the deceased did not return home as scheduled, his sister attempted to contact him at the Monaco address and phone number which she had been given; she discovered that both the address and phone number were non-existent.

On September 26, 1968, two hunters found a badly decomposed human body on the Mud Lake property; a dental examination proved this to be Harvey Rosenzweig's body. The clothing on the body was very similar to that which deceased was described as wearing when last observed by Thompson at the Waukegan Inn. His pockets were empty and one had been turned inside-out.

The state of decomposition prohibited an autopsy but a pathologist testified that a large gaping fracture of the left side of deceased's head was, in his opinion, the cause of death and that the wound had been caused by one or two blows from a blunt instrument. He further testified that, in his opinion, death occurred four to six weeks prior to discovery of the body.

A hatchet, which appeared to have been new, was discovered in Squaw Creek, approximately 45 feet from the body. At the trial, it was demonstrated that the blunt end of the hatchet fit into the rectangular hole in the back of the deceased's skull. Nothing on the skull or the hatchet indicated that the hatchet was the murder weapon but there was testimony that the skull fracture was caused by an extremely similar, if not identi-

cal hatchet. Checking hardware stores in an attempt to trace those which carried that particular brand of hatchet, two deputy sheriffs located one store in McHenry, Illinois; there was no evidence, however, that the hatchet discovered was actually purchased at that store.

Four major issues, three containing sub-issues, are raised in defendant's original brief: (1) the court erred in admitting irrelevant evidence and incompetent hearsay testimony; (2) the court erred in calling William A. Thompson as a court's witness; (3) the court erred in allowing the handwriting analyst to use certain of defendant's handwriting exemplars; and (4) defendant was not proven guilty beyond a reasonable doubt. In a supplemental brief, defendant raises the issue that his sentence was excessive.

I. Did the court err in admitting irrelevant evidence and incompetent hearsay testimony?

Defendant argues that the court erred in admitting the hatchet since there was no compliance with the rule that to be admissible, a weapon must be connected to both the crime and the defendant. *People v. Germany,* 28 Ill.2d 154, 156-157 (1963).

The hatchet, found 45 feet from the body, was fairly new when discovered and its blunt end fit into the hole in the victim's skull. In the opinion of a criminalistics expert, the hatchet caused the hole in the skull, although not to the exclusion of all other similar hatchets. While this evidence tended to circumstantially link the hatchet to the crime, the State concedes that the only evidence linking defendant to the hatchet was the fact that the hatchet could be purchased in McHenry, Illinois and that the decedent had mailed a letter in that city on the day before he was last seen alive. This evidence does not sufficiently link defendant to the hatchet and, consequently, the hatchet should not have been admitted.

In *Germany, supra,* our Supreme Court held that a toy pistol introduced during a robbery trial, although found in defendant's possession, had not been connected in any manner with the crime and was inadmissible. However, it was held that since defendant had been tried in a bench trial, the admission of the pistol was not so prejudicial as to constitute reversible error. In the instant case, there was sufficient evidence linking the hatchet to the crime but not to the defendant. We hold that in this bench trial, as in *Germany,* the introduction of the weapon did not amount to reversible error.

Defendant alleges error in the admission of Carte Blanche credit card invoices indicating charges on Harvey Rosenzweig's credit card. It is argued that these invoices were irrelevant in proving the crime of murder.

■■ We find the invoices to be relevant: each had been written after August 17, 1968, the handwriting expert testified that decedent's signature on the receipts had been forged, and defendant's fingerprints were found on one of the invoices. The invoices provided circumstantial evidence that subsequent to August 17, 1968, someone used decedent's credit card and forged his signature; the fingerprints indicated that this person was the defendant. The fact that the invoices in question were all dated after August 17th added another link to the State's chain of circumstantial evidence toward establishing the date of the crime.

■■ Defendant attacks the testimony of Raedel as being prejudicial and irrelevant. Claimed prejudicial is Raedel's testimony to a conversation with defendant wherein the defendant told him, "He hated cats. He'd like to dissect them if he could." The court, over objection, found the statements germane to the issues. This was error but, in our opinion, was not sufficient to cause reversal. On the balance of Raedel's testimony, defendant raised objections to specific questions by the State; no objections were based upon the admissibility nor was any motion made to strike his testimony as irrelevant. The question of whether Raedel's total testimony was admissible was never raised in the trial court and cannot be raised for the first time on appeal. *People v. Linus,* 48 Ill.2d 349, 355 (1971).

■■ Nevertheless, Raedel's testimony was relevant in that it may have indicated to the trier of fact that defendant was assuming decedent's identity. Decedent lived on Bryn Mawr Avenue in Chicago with female relatives; defendant, in his conversation with Raedel, related a similar situation as his own. Decedent had audited the accounts at Mt. Sinai Hospital in Chicago; defendant told Raedel that he was a physician at that same hospital. Raedel's testimony of defendant's Hong Kong purchase of a sport jacket was relevant in that decedent's signature had been forged on a Carte Blanche purchase made in that city.

Defendant alleges that reversible error occurred when decedent's sister was allowed to testify that upon leaving their home on August 16, decedent stated that he was meeting defendant in order to view the property, and that it was error for her to testify concerning the substance of the phone conversation which she had with decedent the morning of August 17. It is argued that such testimony was hearsay and not admissible as an exception to the hearsay rule.

The State argues that although hearsay, the statements fall within the exception to the rule recognized in *Boyer Chemical Co. v. Industrial Com.,* 366 Ill. 635 (1937). *Boyer* was a workmen's compensation case wherein a witness testified that, prior to returning to Chicago from vacation, the deceased told the witness that he was going to call on

several druggists for business purposes on the way. The court held admissible, statements by a person deceased at the time of trial, made at the time of his departure upon a journey with reference to his destination. It was further held that the test in determining admissibility is whether the declaration is so separated from the act by lapse of time as to render it probable that the party making the declaration was speaking from design rather than instinct.

Defendant correctly notes that the Illinois decisions following *Boyer* and the exception to the hearsay rule recognized therein, are all civil or workman's compensation cases. (See, *e.g., Grola v. Industrial Com.,* 388 Ill. 114 (1944).) We have, however, researched the criminal cases concerning this exception in other jurisdictions. (See, Annot., 113 A.L.R. 268 (1938).) The most recent decision containing a thorough analysis and summary of the law is *State v. Vestal,* 180 S.E.2d 755 (1971), wherein the trial court permitted the wife of a murder victim to testify regarding the deceased's statement made prior to departure from their home in which he spoke of his plan to travel with the defendant on a business trip. The Supreme Court of North Carolina held that although hearsay, the statement was properly admitted as an exception to the hearsay rule in that it satisfied the two-fold basis for hearsay exceptions: necessity (provided by the unavailability of the declarant), and a reasonable probability of truthfulness, in which regard the Court stated:

> "It is the normal, natural, customary routine for a man leaving his home, or office, upon an out-of-town trip to inform some member of his family, or an employee or business associate, of where he is going, with whom and when he will return. Of course, the particular declarant on the particular occasion may falsely state these matters to his wife or to his business associate. The credibility of his statement on the particular occasion is always open to question, but that is a question for the jury. The fact that in the overwhelming preponderance of such instances the statement is true, because it has no purpose or significance except to promote the orderly conduct of the declarant's domestic or business affairs, supplies that reasonable probability of truth in the particular instance which justifies the court in permitting the jury to hear the statement and determine its truth or falsity." 180 S.E. 2d at 773.

In holding the testimony admissible, the Court noted that it was bringing the law into accord with decisions of other courts and with the eminent scholars in the field of evidence. Other courts in recognizing the exception have stated that it is firmly established by the overwhelming

weight of judicial opinion. (See, *e.g.*, *State v. Thornton*, 185 A.2d 9 (S.Ct. N.J., 1962), *cert. den.* 374 U.S. 816, 10 L.Ed.2d 1039, 83 S.Ct. 1710 (1963).) We find the rationale of *Vestal* controlling and hold that deceased's statements made to his sister were properly admitted to show his intent to accompany the defendant in viewing the land and that he, in fact, left home on that ostensible mission. The testimony does not show, nor would it be competent to show any intent on the part of defendant to look at the land or to set out upon such a trip. *Vestal,* at p. 773.

II. Did the court err in calling William A. Thompson as a court's witness?

Defendant argues that it was error to call Thompson, the assistant manager at the Waukegan Inn, as a court's witness after he had identified a deputy sheriff as the man whom he had observed in company with the deceased on two occasions at the Inn. Prejudice is alleged to have occurred as a result of the court's questioning when it was revealed that prior to trial Thompson had (from a photograph) identified defendant as the man who had accompanied the deceased.

■■ The foundation necessary for the calling of a court's witness is that his integrity or veracity is doubtful and that neither side desires to vouch for his testimony. Additionally, the testimony must relate to direct issues and be necessary in order to prevent a miscarriage of justice. *People v. Dennis*, 47 Ill.2d 120, 131-132 (1970); *People v. McKee*, 39 Ill.2d 265, 269-271 (1968); *People v. Moriarity*, 33 Ill.2d 606, 614-616 (1966).

■■ In reviewing the cases concerning this issue, we have found that all contain a factual situation wherein a witness was hostile, his integrity or veracity doubtful, and his veracity vouched for by neither party. These elements were not present in the case at bar. There was no allegation that Thompson was evasive or hostile or that the State could no longer vouch for his veracity. The State only alleged that the witness made "an honest mistake about identification". We have been cited no case authority indicating that this is an adequate foundation for the calling of a court's witness and find that it was error for Thompson to be so called. We hold, however, that the error is not reversible in that the trial judge did not rely upon Thompson's testimony in determining defendant's guilt. During closing argument the judge remarked to defense counsel, "Certainly you got your biggest break from Mr. Thompson, didn't you?" During the hearing on post-trial motions, the judge stated to defense counsel:

> "I have to admit that, as you notice, I've been smiling. It isn't because of the case but the reference to the witness Thompson. I

thought that he was your best witness, and I am addressing myself to the defense counsel now, and I thought even the Judge helped your case along with the interrogation of Mr. Thompson."

III. Did the court err in allowing the use of certain handwriting exemplars?

While defendant was incarcerated awaiting trial he wrote a letter which he gave, unsealed, to the jail authorities for screening and mailing. Defendant was aware of regulations providing for screening of all correspondence. The letter was turned over to an assistant state's attorney who had it photographed and then had the original sent to the intended addressee. A copy of the letter and the envelope were admitted into evidence and were used as exmplars by the handwriting analyst. Defendant urges error on several grounds in the admission of this evidence.

■■ Defendant first argues that prison authorities cannot constitutionally screen or censor correspondence emanating from prisoners. This argument was waived at trial when defendant's counsel stated:

"Your Honor, *I'm not saying the Sheriff of this County doesn't have a right under certain circumstances to censor mail.* It's one thing to censor mail and make sure that the security of the jail remains intact, for which the public is concerned. It's quite another thing to bring in any documents that don't have anything to do with adverse security of the jail, to bring those into evidence * * * and use them in fact against him." (Emphasis added.)

In view of this admission we need not concern ourselves with the burgeoning decisions involving prison officials' authority to censor inmates' correspondence. See, e.g., *Martinez v. Procunier,* 354 F.Supp. 1092 (N.D. Cal. 1973); *Inmates of Milwaukee County Jail v. Petersen,* 353 F.Supp. 1157 (E. D. Wis. 1973); *Collins v. Schoonfield,* 344 F.Supp. 257 (D. Md. 1972); *Woods v. Yeager,* 463 F.2d 223 (3d Cir. 1972); *Sostre v. McGinnis,* 442 F.2d 178 (2d Cir. 1971), cert. denied; *Sostre v. Oswald,* 404 U.S. 1049, 30 L.Ed.2d 740 92 St.Ct. 719 (1972).

Defendant then contends that the use of the letter violated his constitutional rights of privacy and protection against unreasonable searches and seizures.

We have found no Illinois case in point on this portion of the argument. However, in *Stroud v. United States,* 251 U.S. 15, 64 L.Ed. 103, 40 S.Ct. 50(1919), letters, written by a prison inmate while awaiting trial and containing inculpatory language, were introduced into evidence. The Court held that defendant's fourth and fifth amendment rights had not been violated.

"In this instance the letters were voluntarily written, no threat or

coercion was used to obtain them, nor were they seized without process. They came into the possession of the officials of the penitentiary under established practice, reasonably designated to promote the discipline of the institution. Under such circumstances there was neither testimony required of the accused, nor unreasonable search and seizure in violation of his constitutional rights." 251 U.S. at 21-22.

Stroud is still the law today and has been followed in several decisions. In State v. Johnson, 476 S.W.2d 516 (S.Ct. Mo. 1972), cert. den., (U.S.) 34 L.Ed.2d 105, 93 S.Ct. 144 (1972) (a restatement of the rationale of State v. Johnson, 456 S.W.2d 1 (1970)), a letter containing incriminating admissions was written by defendant while confined in jail, intercepted by jail officials with defendant's consent pursuant to censorship regulations, and subsequently admitted into evidence. The court held that the use of the letter did not violate the privilege against self-incrimination or the constitutional protection against unreasonable searches and seizures.[1] Denson v. United States, 424 F.2d 329 (10th Cir. 1970), cert. denied, 400 U.S. 844, 27 L.Ed.2d 80, 91 S.Ct. 88 (1970), concluded that there was no violation of the privileges against self-incrimination and unreasonable search and seizure when copies of coded messages, containing self-incriminating statements, were introduced into evidence, the messages having been voluntarily written while in prison and given to inmate orderlies who in turn gave them to penitentiary officers. In Baker v. State, 202 So.2d 563 (S.Ct. Fla. 1967), it was held that there was neither invasion of defendant's right to privacy nor illegal seizure when a letter which defendant had written while incarcerated and given to a jailor for mailing, was read as a standard security measure, copied and used against him at trial. The court in Hayes v. United States, 367 F.2d 216 (10th Cir. 1966), held that there was no violation of the right to privacy when a voluntarily written letter, copied in the usual course of prison administration, had been introduced into evidence. See also United States v. Wilson, 447 F.2d 1 (9th Cir. 1971), cert. denied, 404 U.S. 1053, 30 L.Ed.2d 742, 92 S.Ct. 723 (1972).

■■ We have neither been cited nor found a decision which disallowed admission of a copy of a prisoner's letter which had been voluntarily written with knowledge that it would be scrutinized by prison officials pursuant to censorship regulations. A distinction might be drawn between the cited cases and the case at bar for here it was not the written

[1] In the first Johnson decision, the court held that the use of the letter was proper but reversed and remanded on the grounds that certain prejudicial portions of the letter should have been deleted. Defendant was retried, found guilty and again perfected an appeal. In the second Johnson decision his conviction was affirmed.

admissions of defendant which were used against him but his handwriting itself. However, for the purposes of this issue, we do not find this distinction sufficient to justify a departure from the law as set forth in the pertinent cases. We find no error in admission of defendant's letter.

■■ Defendant also argues that the letter, written to Jerry Rubin, was used to prejudice the trier of fact by linking defendant to a known radical. We note that the State introduced the letter for a limited purpose, that of a handwriting exemplar, and that the trial judge stated at the time it was admitted, and subsequently restated, that he had not and would not read the letter. Therefore, no error occurred.

■■ Defendant alleges that his rights under *Miranda v. Arizona,* 384 U.S. 436, 16 L.Ed.2d 694, 86 S.Ct. 1602 (1966), were violated when, during an interrogation session, and after stating that he did not wish to discuss the charges, defendant gave certain handwriting exemplars. This argument is untenable in that defendant voluntarily gave the authorities the handwriting exemplars, the assistant state's attorney having testified that, after giving defendant his *Miranda* warnings, defendant stated:

"A. * * * he did not wish to discuss the charges against him on the basis of the advice of * * * counsel.

* * *

A. I then asked him for handwriting samples.

* * *

A. I said, 'Mr. Reddock, I want to take handwriting samples from you.'

* * *

A. He said, 'I will give them to you voluntarily.'
Q. Did he say anything else?
A. He said, 'I'm sure you can get them anyway.' "

Additionally, in concluding that no error occurred, it appears that handwriting exemplars are not protected by the fifth amendment privilege against compulsory self-incrimination. See, *United States v. Dionisio,* (U.S.) 35 L.Ed.2d 67, 93 S.Ct. 764 (1973); *Gilbert v. California,* 388 U.S. 263, 18 L.Ed.2d 1178, 87 S.Ct. 1951 (1967); *People ex rel Hanrahan v. Power,* 54 Ill.2d 154 (1973).

IV. Was defendant proven guilty beyond a reasonable doubt?

Under this issue, defendant raises two sub-arguments, one relating to Louis Behm's in-court identification of defendant as the man to whom he showed the Mud Lake property, and the other, to the testimony of attorney Kahn concerning a telephone conversation he had with a man purporting to be defendant. It is unclear whether these sub-arguments are directed toward the testimony's weight or admissibility; we will consider the issue from both aspects.

Prior to trial, Louis Behm was unable to identify defendant from twelve photographs shown him. He also failed in an effort to compose a picture of defendant with an "identi-kit." Behm testified that on a subsequent visit by the police, he was shown one photograph and identified that as the defendant. It is now alleged that this pretrial identification was unnecessarily suggestive and conducive to a mistaken identification of defendant at trial.

■■■ We find no error in Behm's in-court identification because, first, defendant failed to object to the suggestiveness of the pretrial identification, precluding consideration of the issue (*People v. Rodgers,* 53 Ill.2d 207, 213 (1972)), and second, we are convinced that Behm's in-court identification had "an origin independent of the photographic identification proceedings and was uninfluenced thereby," he having had an excellent opportunity to view defendant (*People v. Rodgers, supra*). Behm testified that he was with the prospective buyer for an hour; that although he never looked at the man's face for any long, uninterrupted period of time, he did glance at his face occasionally and spent a total of 15 minutes in doing so; that he felt that he had observed the man's face closely. See *People v. Moore,* 7 Ill.App.3d 315, 317 (1972) and cases cited therein.

Questioning the admissibility of part of attorney Kahn's testimony, defendant alleges that there was no proof that the man Kahn spoke to was defendant except for the hearsay testimony relating deceased's introduction of the man over the telephone.

■■ In a criminal case, telephone conversations are competent evidence provided that the identity of the person with whom the conversation was had is established by direct evidence, facts or circumstances. (*People v. Nichols,* 378 Ill. 487, 490 (1942); *People v. Conway,* 3 Ill.App. 3d 69, 72 (1971).) In the instant case, the identity of the party to whom Kahn spoke could be circumstantially proven by considering several factors: the individual was introduced to Kahn by defendant's name and such introduction was not disputed; the individual gave Kahn details of the proposed business transaction; but most importantly was that during a conversation with Behm, defendant spoke of the arms corporation and its proposed investment activities, indicated that a man named Rosenzweig would run the operation, and named Kahn as Rosenzweig's attorney.

■■ Were we to assume error in the admission of Kahn's testimony concerning the conversation, the error would be harmless. The fact that defendant knew the deceased and the details of their proposed business ventures, if not properly disclosed by Kahn's testimony, was properly and more convincingly established by Behm's testimony.

310

■■ We have carefully reviewed the evidence in this case and find that, although circumstantial in nature, the evidence is not only consistent with defendant's guilt, but inconsistent with any reasonable hypothesis of innocence. (*People v. Branion,* 47 Ill.2d 70, 77 (1970).) The evidence produces a reasonable and moral certainty that the accused and no one else committed the crime. (*People v. Marino,* 44 Ill.2d 562, 580 (1970).) While one might not have been satisfied beyond a reasonable doubt as to each link in the chain of circumstances, the evidence, considered as a whole, proves defendant's beyond a reasonable doubt. *People v. Marino, supra.*

V. Was defendant's sentence excessive?

Defendant was sentenced on December 8, 1971, to serve a term of from 30 to 50 years in the state penitentiary. In aggravation, the State produced evidence indicating numerous convictions for fraud and forgery. The defendant alleges that this sentence is not in accord with the Unified Code of Corrections, Ill. Rev. Stat. 1973, ch. 38, sec. 1005—1—1, *et seq.*

■■ Although defendant was sentenced prior to the effective date of the Code, its provisions apply herein because direct appeal was not finally adjudicated as of the effective date of the statute. *People v. Chupich,* 53 Ill.2d 572 (1973); *People v. Harvey,* 53 Ill.2d 585 (1973); *People v. Keating,* 2 Ill.App.3d 884 (1971); *People v. McCloskey,* 2 Ill.App.3d 892 (1971).

■■ Under the prior statutes, the penalty for murder was the same as that established by the new Code, *i.e.,* a 14 year minimum sentence. (See Ill. Rev. Stat. 1967 and 1971, ch. 38, sec. 9—1.) The trial judge had the use of a presentence report and stated that he had considered many points in handing down the sentence. Our review discloses that the trial court followed the sentencing procedures of the Code and the motion to reduce sentence is, therefore, denied.

Finding no reversible error, we affirm the judgment of the lower court.

Judgment affirmed.

ABRAHAMSON and SEIDENFELD, JJ., concur.