THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CUAHATEMOC HERNANDEZ, Defendant-Appellant.

First District (5th Division)   No. 1—01—0792

Opinion filed June 28, 2002.

344

Rita A. Fry, Public Defender, of Chicago (Todd Avery Shanker, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Peter D. Fischer, and Owen D. Kalt, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GREIMAN delivered the opinion of the court:

Defendant Cuahatemoc Hernandez was charged with first degree murder and attempted first degree murder. After a jury trial, he was found guilty on both counts and was sentenced to 44 years' imprisonment for first degree murder and a concurrent term of 6 years for the attempted first degree murder charge. Defendant now appeals, and no issues are raised regarding the pleadings. For the reasons that follow, we affirm.

At trial, Alfredo Leon testified that on April 16, 1998, around 8 p.m., he drove to the house of his cousin, Jose Ortega, to pick him up. The two of them then drove to 18th Street. When they saw the defendant walking down the street, Jose instructed Alfredo to pull over so he could talk to his friend. Alfredo testified that he had seen the defendant two or three times before and knew the defendant as "Temo." The defendant got into the backseat of the two-door Toyota

and the three men then "drove around." At the defendant's request, Alfredo stopped the car at West 18th Place and May Street so that the defendant could talk to some of his friends. When the defendant got back into the Toyota, he told Alfredo to drive to the defendant's house so that he could get something. Alfredo testified that he drove the defendant to his home and that he parked in an alley near the house. Alfredo and Jose remained in the car while the defendant got out and walked toward 19th Place. After approximately five minutes, the defendant emerged from a house that was not his own. Defendant had one hand under his coat and he walked toward the driver's side of the Toyota. Alfredo was about to open the door when the defendant brandished a gun, pushed it through the driver's side window, and then started shooting at them both. Alfredo stated that he covered his head with both of his hands and ducked down into the car seat. He also testified that he heard approximately nine gunshots. One bullet struck Alfredo in the back of the head, injuring his fingers in the process.

After the shooting stopped, Alfredo turned and saw that Jose was slumped over in the car seat. He testified that, at the time, he did not know if Jose was alive or dead. Alfredo then drove his car to the home of Jose's brother, Mauricio Ortega, about one block away. Upon arriving at Mauricio's house, Alfredo got out of the car and ran to see Mauricio.

After Alfredo testified, Mauricio took the stand and confirmed that Alfredo came to his door on the night of April 16, 1998. Alfredo was bleeding and was "very nervous, very scared" and "very excited" as he told Mauricio that "Temo" had shot at them. Mauricio then got into the car and instructed Alfredo to drive them to Cook County Hospital. Alfredo parked near the emergency entrance of the hospital and ran inside where he told police officers and the emergency medical personnel what had happened. The doctors put Jose on a stretcher and rolled him into the emergency room and examined Alfredo for his injures.

Jose died as a result of multiple gunshot wounds. During the autopsy, the medical examiner found one bullet wound to the deceased's inner right thigh, one to the back of his left hand near the base of his thumb, and one to the back of his head. The wounds were consistent with Jose being in a seated position and the shooter standing above him and on his left. However, there was no evidence of close-range fire on Jose's skin. Close-range stippling usually occurs when the weapon is fired from 18 inches away or closer. The parties stipulated that a firearms expert would testify that all three bullets recovered from Jose's body were fired from the same gun.

Alfredo was treated at Cook County Hospital for a period of one week. During that time, police officers visited Alfredo, and he told them that "Temo" was the person who had shot him and his cousin. He also gave the officers the defendant's address. In addition, both Alfredo and Mauricio identified a photograph of the defendant. At trial, Alfredo denied telling police officers who were present in the emergency room that he and the others had been at a party, had an argument, and that the shooting occurred outside the party.

One week after he was released from the hospital, Alfredo moved from Illinois to Nebraska. At trial, Alfredo explained that he moved away because he was afraid of the defendant's family. After a few months, Alfredo returned to Chicago so that he could meet with Detectives Vasilopoulos and Deacy on July 15, 1998. Subsequently, however, Alfredo moved from Nebraska to Idaho, again allegedly out of fear of the defendant's family. He also acknowledged at trial that the State's Attorney's office had to send investigators to bring him back for trial. The State's Attorney's office paid for his transportation to Chicago so that he could testify.

Detective Vasilopoulos testified that at 10 p.m., on April 16, 1998, he and his partner, Detective Deacy, drove to Cook County Hospital to respond to a radio call. Upon arrival, he found the victim's car parked outside the emergency room entrance. A window had been shattered and there was blood in the car. Detective Vasilopoulos found a quarter-sized spot of saliva on the top of the driver's side door. He testified that it looked as if someone had spit on the car's door. This saliva was inventoried and tested, and it was determined to have a DNA profile that matched that of the defendant. In fact, it was stipulated at trial that this DNA profile would be expected to occur in approximately 1 in 2.1 quadrillion unrelated Hispanic persons. However, there was no fingerprint evidence linking the defendant to the car.

Victoria Hernandez Hill, the defendant's sister, testified that she and her brother were living in the same house in West 18th Place in Chicago during April of 1998. She testified that he left their home on the night of April 16, 1998, and she did not see or hear from the defendant again until August 21, 1998.

Defendant was arrested in California on July 22, 1998. He was in possession of a California state identification card that listed his name as "C. Miguel Hernandez." The defendant's brother, Santiago, lived in California and, prior to the incidents in this case, the defendant had visited him three or four times for different periods of time.

For the defense, police officer Terry Abbate testified that he was already present at Cook County Hospital when Alfredo arrived on the night of the shooting. Officer Abbate interviewed Alfredo within two

to four minutes of Alfredo's arrival at the hospital. Abbate testified that Alfredo was "very frantic" during the interview and that Alfredo was attempting to get doctors to come outside and help his cousin, who was still in the car. Abbate testified that after he spoke with Alfredo, he told his partner what Alfredo had said. When Officer Abbate's partner returned to the police station, he prepared a written report. Later, Abbate read and signed the report. According to the report, Alfredo identified himself as Leon Villejo and stated that there were three victims; that the three victims were at a party at a nearby house; that the three victims got into an argument with the defendant; and that they went outside with the defendant to discuss the matter.

Moreover, Officer Vasilopoulos testified that, in his interview with Alfredo, Alfredo stated that he drove to Jose's house in the evening on April 16, 1998, and that Jose was taking a shower. Alfredo stated that Jose told him to "go pick up Temo," and that he then drove around 18th Street by himself. Finally, he stated that after he picked up Temo, he returned to Jose's house to pick him up. Alfredo, however, denied all of those facts at trial.

After closing arguments, the jury returned guilty verdicts for first degree murder and attempted first degree murder. Thereupon, defendant was sentenced to concurrent terms of 44 years for first degree murder and 6 years for attempted first degree murder. Defendant's motion to reconsider his sentence was denied.

■ A trial court has considerable discretion in determining the admissibility of hearsay statements, and this court will not disturb the court's ruling absent an abuse of that discretion. *People v. West*, 158 Ill. 2d 155, 164-65 (1994). The defendant's main argument on appeal is that the trial court abused its discretion when it refused to allow him to present evidence of his statements of future intent through the testimony of his siblings. He notes that evidence of statements of future intent have been considered admissible, as an exception to the hearsay rule, to show the intent of the declarant and to prove "the doing of the intended act." M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 803.5, at 802 (7th ed. 1999). Such evidence, he continues, is admissible regardless of the unavailability of the declarant. M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 803.1, at 786-89 (7th ed. 1999). In addition, the declaration of future intent need not be contemporaneous with a related act. M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 803.7, at 805-06 (7th ed. 1999).

Here, defendant requested to adduce evidence of his statements to his brother and sister regarding his intent to move to California prior to the incidents of this case. These statements, defendant notes, were

made well before he actually moved to California as, according to the offer of proof by defense counsel, the defendant had "been talking about [the move] for months." The defendant also asserts that this evidence was crucial to rebut the State's claims that his move to California demonstrated his consciousness of guilt and that he was intending to flee from a murder conviction.

The trial court, however, ruled that this evidence was inadmissable for two reasons. First, the court held that evidence of declarations of future intent were only admissible when the declarant was unavailable. The court noted that since the defendant was available, he had to testify before any evidence of his declarations to his brother and sister could be entered into evidence. Second, the court found the evidence unreliable due to a presumed bias on the part of the defendant's siblings.

■ This finding, defendant asserts, is in error. The supreme court has held that in criminal cases, a defendant has the right to show, by any competent evidence, facts which tend to prove that the defendant did not leave from a consciousness of guilt. See *People v. Manion*, 67 Ill. 2d 564, 576 (1977), citing *People v. Autman*, 393 Ill. 262 (1946), and *People v. Davis*, 29 Ill. 2d 127 (1963). Moreover, defendant claims, the trial court's finding is directly contradicted by the factually comparable case of *People v. Reddock*, 13 Ill. App. 3d 296 (1973). In *Reddock*, this court found that a deceased declarant's statements to his sister were admissible to show his intent to accompany the defendant on a trip and that he left on that trip. *Reddock*, 13 Ill. App. 3d at 304-05. See also *People v. Silvestri*, 148 Ill. App. 3d 980, 985 (1986) (holding that the victim declarant's statement was admissible to show her intention of meeting the defendant on the thirteenth floor of a building).

Here, defendant intended to bring out evidence of his statements to his brother and sister to show that he intended to move to California prior to the shooting. Such a declaration of future intent should have been admissible, he argues, to show his intent—regardless of his availability. Accordingly, he concludes that by being unable to counter the State's claim that he moved to California to flee a murder conviction and that his flight showed consciousness of guilt, he was undeniably prejudiced.

The State does not quibble with the defendant's definition of the "declaration of intent" hearsay exception. Indeed, it too cites Cleary and Graham's Handbook of Illinois Evidence for the proposition that a declaration of intent "may be admitted as proof that the intended act was done." In the present case, the defendant argues that he should have been allowed to prove that he previously spoke of his intent to

move to California. Therefore, the "intended act" was his actual moving to California. However, as the State notes, there was no issue as to whether the intended act was already completed, as the State had already proven that the defendant had moved to California. Accordingly, the State claims that because the defendant is not arguing that his declaration of intent should have been admitted to prove that the intended act was actually done (*i.e.*, that he moved to California), the hearsay exception does not apply in this case.

■ The State is correct that section 803.5 of Cleary & Graham's Handbook of Illinois Evidence indicates that the declaration of intent exception to the hearsay rule can only be used to prove that the declarant did the act that he intended. Following the State's argument, therefore, it might appear that this exception cannot be used as evidence of the declarant's intent. However, this is contrary to this court's previous holdings in *Reddock* and *Silvestri*, and section 803.7 of Cleary & Graham's Handbook of Illinois Evidence, all of which specifically found the declaration of intent exception to permit a declarant's hearsay statement to show his or her intent to do something *or* to prove that he or she did so. *Reddock*, 13 Ill. App. 3d at 305; *Silvestri*, 148 Ill. App. 3d at 984; M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 803.7, at 805-06 (7th ed. 1999). Accordingly, we find that the State's argument on this ground fails.

Nevertheless, with regard to the defendant's contention that the trial court erred in finding the exception inapplicable due to the defendant's availability to testify, both *Reddock* and *Silvestri* seem to indicate otherwise. In fact, in both cases, the declarants were actually decedents, thereby rendering them most unavailable.

In *Reddock*, the first criminal case in Illinois concerning this exception, the court looked to other jurisdictions for guidance. In so doing, it found the then-recent case of *State v. Vestal*, 278 N.C. 561, 180 S.E.2d 755 (1971), to contain a thorough analysis and summary of the law. In *Vestal*, the *Reddock* court noted:

> "[T]he trial court permitted the wife of a murder victim to testify regarding the deceased's statement made prior to departure from their home in which he spoke of his plan to travel with the defendant on a business trip. The Supreme Court of North Carolina held that although hearsay, the statement was properly admitted as an exception to the hearsay rule in that it satisfied the two-fold basis for hearsay exceptions: necessity (provided by the unavailability of the declarant), and a reasonable probability of truthfulness \*\*\*." *Reddock*, 13 Ill. App. 3d at 304.

Accordingly, it appears that if the *Vestal* court had not found the factual circumstances of that case matched what it considered the

two-fold basis for hearsay exceptions, it, as well as the *Reddock* court, would have found the exception to be inapplicable.

In *Silvestri*, the court reiterated that two-fold basis for hearsay exceptions:

"Statements indicating a declarant's state of mind are admissible as exceptions to the hearsay rule if the declarant is unavailable and there exists a reasonable probability that the testimony is truthful. *(People v. Floyd* (1984), 103 Ill. 2d 541, 470 N.E.2d 293; *People v. Bryant* (1984), 123 Ill. App. 3d 266, 462 N.E.2d 780.) Such statements, however, must be relevant to a material issue in the case. *(People v. Floyd* (1980), 103 Ill. 2d 541, 470 N.E.2d 293; *People v. Bryant* (1984), 123 Ill. App. 3d 266, 462 N.E.2d 780.) A decedent's hearsay statement is admissible, for example, to show his intent to accompany defendant someplace or to prove that he did so ***." *Silvestri*, 148 Ill. App. 3d at 984, citing *Reddock*, 13 Ill. App. 3d at 296.

Accordingly, before making the determination that the declarant's statements were admissible, it first made the explicit finding that the victim was unavailable to testify and that there was a reasonable probability that the testimony was truthful. Accord *People v. Coleman*, 116 Ill. App. 3d 28 (1983); *Laughlin v. France*, 241 Ill. App. 3d 185 (1993); *People v. Davis*, 254 Ill. App. 3d 651 (1993); *People v. Curtis*, 262 Ill. App. 3d 876 (1994).

As defendant notes, however, there are also cases that have admitted evidence under this exception without determining a declarant's availability. See *Mutual Life Insurance Co. of New York v. Hillmon*, 145 U.S. 285, 295-96, 36 L. Ed. 706, 710, 12 S. Ct. 909, 912-13 (1892); *People v. Bartall*, 98 Ill. 2d 294, 319-20 (1983). In the recent case of *People v. Hansen*, 327 Ill. App. 3d 1012 (2002), this court, in a footnote, recognized this dispute:

"Our supreme court has *** stated that the declarant must be unavailable in order for his statement to be admissible under this exception. [*People v.*] *Floyd*, 103 Ill. 2d [541, 546 (1984)]. Pursuant to the Federal Rules of Evidence, [however,] statements are admissible under the state-of-mind exception even if the declarant is available (Fed. R. Evid. 803(3)), and it has been suggested that this should be the rule in Illinois. See M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 803.4, at 801-02 (7th ed. 1999)[('The disturbing indication that this hearsay exception requires that the declarant be unavailable [citations] is incorrect, ill-advised and accordingly should not be followed ***.')]; *People v. Nyberg*, 275 Ill. App. 3d 570, 586, 646 N.E.2d 65 (1995) (Wolfson, J., specially concurring) [(opining the belief that an available declarant's statement of his then-existing state of mind can be reli-

able evidence)]; [*People v.* ]*Berry*, 172 Ill. App. 3d 256 [(1988)]." *Hansen*, 327 Ill. App. 3d at 1023 n.2.

In the end, the *Hansen* court found that because the declarants all were unavailable in that case anyway, it need not concern itself with this dispute. *Hansen*, 327 Ill. App. 3d at 1023 n.2.

■ Ultimately, regardless of what we may think of the supreme court's requirement that the declarant be unavailable, we are bound to follow the precedent set in *Floyd*, especially considering that the supreme court more recently denied the appeal of both *People v. Silvestri*, 113 Ill. 2d 583 (1987), and *People v. Nyberg*, 165 Ill. 2d 561 (1996). These denials seem to indicate that the court does not intend to change its position that the declarant needs to be unavailable to fit within this exception. See *Chicago Journeymen Plumbers' Local Union 130 v. Department of Public Health*, 327 Ill. App. 3d 192, 201 (2001) (finding that the appellate court has no authority to overrule or modify a supreme court opinion); *People v. Quick*, 321 Ill. App. 3d 392, 395 (2001) (finding that it is not a proper function of the appellate court to act as an advisory body to the supreme court). Consequently, under *Floyd*, we affirm the decision of the trial court.

However, even if we were to reverse the trial court's rejection of the defendant's evidence of his declaration of intent due to the defendant's availability, our job would not be complete. Rather, we would then also look to what has been deemed a more important factor: the reliability of that hearsay evidence. As the supreme court has noted, "the question to be considered in deciding the admissibility of *** an extrajudicial statement is whether it was made under circumstances which provide 'considerable assurance' of its reliability by objective indicia of trustworthiness. [Citation.]" *People v. Thomas*, 171 Ill. 2d 207, 216 (1996).

In the instant case, the trial court found that the defendant's statement was not made under circumstances that provided a considerable assurance of reliability, *i.e.*, it found that the brother's and sister's testimony would be biased. Moreover, their proposed testimony would not have been specific. The offer of proof was that the defendant's siblings would have testified only that the defendant had been "planning to move to California. He had been talking about it for months." However, the siblings would not have testified that the defendant said that he intended to leave on April 16, or any other particular time, just that he had been planning to move. Given the great discretion the trial court is allowed to employ (see *West*, 158 Ill. 2d at 164), we could rightly defer to that discretion and affirm its finding of unreliability.

In any event, even if we were to have found that the trial court erred in excluding that evidence, we also think that such error would

be harmless. Mindful of the nonspecific nature of his siblings' proposed testimony, we think that if it had been introduced, it would have done little to persuade the jury that the defendant's departure on the very night of the shooting was preordained. As the State points out, evidence which is general or which lacks specificity has less weight than that which is specific. See *People v. Owens*, 323 Ill. App. 3d 222, 233 (2001).

In addition, the excluded testimony was cumulative of other evidence that enabled the defendant to make the exact same argument that he claims he was precluded from making. During trial, the court permitted the defense to ask the defendant's other brother, Miguel, if he has any relatives who live in California. Miguel testified that he and the defendant have an older brother named Santiago who lives in California, and he further testified that the defendant went there to visit Santiago three or four times in the past. During closing argument, defense counsel emphasized that the defendant had gone to California at least three times before going there on April 16, 1998, that the defendant had a family member in California, and that previously he had spent three years of his life in California. Defense counsel also argued that defendant's move to California was not suspicious because he had "ties to the community" whom he visited there. In the end, therefore, it appears that the evidence that was presented at trial did enable defense counsel to counter the State's argument that the defendant moved to California in an attempt to flee a murder conviction and that such flight showed defendant's consciousness of guilt. In short, because this testimony would have added nothing to the evidence that was already in the record, any potentially perceived error was harmless.

For all of the above stated reasons, we affirm the defendant's conviction and sentence.

Affirmed.

QUINN and REID, JJ., concur.