THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
GEORGE E. LAWSON, Defendant-Appellant.

First District (4th Division)    No. 78-1357

Opinion filed June 26, 1980.—Rehearing denied July 25, 1980.

Ralph Ruebner and Patricia Unsinn, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Myra J. Brown, and William Gamboney, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE LINN delivered the opinion of the court:

At the conclusion of a jury trial in the circuit court of Cook County, defendant, George Lawson, was convicted of murder. (Ill. Rev. Stat. 1975, ch. 38, par. 9—1.) Defendant was sentenced to a prison term of 18 to 30 years.

On appeal, defendant contends: (1) he was not proved guilty beyond a reasonable doubt; (2) the State committed plain error when it elicited, as substantive evidence of his guilt, a witness' prior inconsistent statements inculpating defendant; (3) the testimony of a State's witness was rehabilitated improperly with evidence of prior inconsistent statements; (4) evidence of a police officer's efforts to arrest defendant lacked probative value and admitting such evidence was prejudicial; (5) he was denied a fair trial when the trial court refused to call a witness as a court's witness; (6) he was restricted improperly in efforts to present relevant evidence to the jury; (7) he was denied a fair trial by the State's closing argument; (8) his right to be presumed innocent was violated when the State commented on his failure to present the testimony of alibi witnesses; (9) he was denied effective assistance of counsel because his attorney labored under a *per se* conflict of interest.

We affirm. An analysis of the factual background is required since defendant raises a reasonable doubt issue.

The evidence discloses that during the early morning hours on July 16, 1976, Lalice Stanley was in his apartment when he was shot with a .38-caliber gun. He sustained a bullet wound to his neck which lacerated his larynx and caused his death. Defendant was charged with Stanley's murder.

At trial, during opening statements, defense counsel informed the jury that the evidence would show that Lenora Dean, who was present during the shooting, first told the police and the grand jury that defendant shot Stanley but later, at defendant's bond hearing, told the court that defendant did not shoot Stanley. The jury also was advised that Dean had been indicted for perjury. Defense counsel further asserted the evidence would show that the three persons who were present in Stanley's apartment when he was shot were angry with defendant and conspired to falsely identify defendant as the murderer.

The State's witness, Terry Ann Jones, was present in Stanley's apartment when he was shot. On direct examination, she testified that she had known Stanley for approximately four years, but she did not know defendant. On July 16, 1976, Jones lived with James Henley, who also was

present in Stanley's apartment when the shooting occurred. Stanley was Lenora Dean's boyfriend.

Jones further stated that on the evening of July 15, 1976, prior to the shooting incident, she was with Henley, Dean, and Stanley in the central courtyard of her apartment building. They were there about 10 minutes when Dean began to break defendant's car window. Defendant's car was parked in a lot about 25 feet away from them. From the porch of his building, defendant yelled to Dean to stop damaging his car. Defendant then came downstairs and Stanley grabbed him. A struggle ensued, although no blows were exchanged and no weapons were displayed. As defendant walked towards an apartment building he said, "I'm not going to take no ass whipping, I'm not; going to get my gun." Defendant's wife, who was carrying a knife, started to fight with Dean. Jones asserted she stopped the fight and no one was hurt.

Jones further testified that after defendant left the area, sometime between 10:30 p.m. and 11:30 p.m., she, Henley, Dean and Stanley went to Jones' apartment to check on her children. The group then went to Dean's apartment to play cards. Dean and Stanley were living together at this time. As Stanley walked to the back of the apartment to get a chair, Jones heard a loud noise and Stanley dropped the chair. Jones ran to the screen door and saw defendant with a gun in his hand standing outside the door. Henley walked up behind Jones and looked out the door. Defendant then left the area. Jones stated she was face to face with defendant and a light outside the screen door provided illumination. There also were lights on inside the apartment.

Jones further stated that after defendant left the area, she turned to look at Stanley who was lying on the floor and bleeding from the neck. Henley placed towels over Stanley's neck and Dean called the police. At the close of Jones' direct examination, she identified defendant as the man she saw standing outside Dean's screen door.

On cross-examination, Jones admitted she had been subpoenaed to testify. She denied that she had been "getting high" on the night of the incident. Jones recalled a conversation she had with Investigator Dahlberg on the morning of July 16, 1976, but she could not remember telling him that Dean had a knife. Defense counsel showed Jones a transcript of her conversation with Dahlberg and then asked her whether she had told Dahlberg that she had seen Dean with a knife. Jones denied ever giving a statement in which she said she saw Dean produce a knife and attack anyone. When asked if she saw Dean with a knife, Jones stated, "I saw her comprehend me the knife. [Sic.]" Upon further questioning, Jones asserted the only time Dean had the knife was during the earlier struggle with defendant's wife. Dean had taken the knife away

from defendant's wife. Dean then threw the knife down on the ground.

Jones further testified that she could not recall any other persons in the courtyard during the struggle, but she did remember seeing some people on the porch. Jones also stated she was not too far—about 10 feet—from defendant when he said he was going to get his gun. At that time, Henley was sitting on the bench and Dean was approximately 35 feet away, near the parking lot.

Jones stated further that between the time defendant initially left the group, she saw defendant twice: first, when he was struggling with Henley; and second, after he had shot Stanley. She could not recall telling Investigator "Goldberg [sic]" that after defendant left, saying he would get his gun, he returned to the courtyard carrying a stick. She also could not remember telling "Goldberg [sic]" that the victim "backed up and we all left."

After Jones was shown a copy of her written statement, she admitted making the statement to Investigator Dahlberg, but again asserted she did not see defendant return to the courtyard prior to the shooting. When asked if she was saying the statement was false Jones said, "I'm not saying that, I say that I didn't see him come back, maybe at that time everybody was all upset, I probably did make that statement, I did make it." Jones then admitted she saw defendant return to the courtyard a second time and that the statement she had made previously was accurate.

Jones then described that defendant returned with a stick to the courtyard approximately 10 to 15 minutes after he first left the area. Jones was then standing near a bench, Dean was standing near Jones' building, and Stanley was standing next to defendant, about 15 feet from Jones. She did not see defendant with a gun. She saw defendant hit Stanley with the stick, but she could not see where Stanley was hit. Jones further asserted she did not see Stanley stab defendant. Stanley "backed down" from the fight, defendant left the area, and the group went to Dean's apartment to play cards.

Jones identified a diagram of Dean's apartment which she had drawn. She also stated that from where she was seated in Dean's kitchen, she could not see the screen door. When Stanley was walking with a chair towards the kitchen, Jones, Dean, and Henley were seated at the table in the kitchen.

Jones asserted she was at the table after she heard the gun fire and saw Stanley spin around and fall into the living room. When Stanley fell, Dean was standing near the table, and Henley followed behind Jones while she ran to the door.

Jones again stated she saw defendant standing outside the front room screen door, with a gun in his hand. She also admitted she had told the

grand jury she had seen defendant with a gun. Defense counsel questioned Jones as to whether she had told Inspector Deloughery that she did not see a gun and Jones responded that he had not asked her about a gun. She also stated she could not remember Investigator Dahlberg. She did remember speaking with police officers about the incident in Dean's apartment. She also recalled speaking with other police officers about the incident at the police station. Jones admitted she had told Investigator Dahlberg that she had heard a gun shot, saw Stanley fall, went to the door, and saw defendant.

On further cross-examination of Jones, the following colloquy took place:

"Q. And you're saying you do not recall telling Inspector Deloughery that you didn't see a gun in the hands of the man at the door?

A. I said he didn't ask me about a gun.

Q. So, you're positive that you never told him you didn't see a gun?

A. I didn't hear.

Q. Are you positive you never told Inspector Deloughery that you didn't see a gun?

A. I don't understand what you're saying.

Q. Mrs. Jones, I was, what I'm asking, you're sure —

A. — yes —

* * *

A. I told the police at the house that I seen the gun [sic]."

Jones further stated that defendant stood outside the screen door "around one or two minutes, it wasn't that long, just until he turned around, around, about one or two minutes." Jones also stated she recalled seeing defense counsel with a young woman, "Ronella Connors [sic]" (Rozelle Conyers), in Jones' apartment, speaking with Henley.

She admitted she had informed Henley that he did not have to speak with defense counsel. Jones denied that she had picked up a diagram which Henley had drawn and accused defense counsel of drawing it. Jones also denied that when Officers Gunnell and Johnson arrived at Dean's apartment after the shooting, she told them she only had seen a man running from the door.

On redirect examination, the State questioned Jones as to whether she had told police officers Gunnell and Johnson who she had seen outside the door. After Jones responded yes, she was asked whether she had spoken with several different investigators after she went to the police station. Jones responded that she had spoken with only one investigator. The State then questioned her as follows:

"Q. And did you speak to them prior to them taking the statement from you?

A. Yes.

\* \* \*

Q. Who did you tell the investigators you saw?

[Defense counsel]: Objection.

\* \* \*

Q. Who did you tell Investigators [sic] was outside that screen door holding a gun in his hand after Lalice Stanley was shot?

A. George Lawson.

Q. When you gave the police officers a written statement, \* \* ,\*, who did you say \* \* \* was the person \* \* \* standing outside the door with the gun in his hand?

A. George Lawson.

Q. When you testified before the grand jury \* \* \* who did you name as the shooter?

A. George Lawson."

Jones further testified that prior to the shooting incident, defendant had been Dean's boyfriend. She also stated that when she saw defendant standing outside Dean's apartment door, defendant was standing less than one foot away from her.

On re-cross-examination, Jones indicated she had spoken with two police officers at Dean's apartment and one officer at the police station. She also stated that after Dean had obtained the knife from defendant's wife when she was fighting with Dean, Dean threw the knife "where Mrs. Lawson was at." On further redirect examination, Jones testified she had talked with only one police officer at the police station and he also obtained a written statement from her.

Officer Robert Gunnell testified as a State's witness. On the night of the incident, he was working with his partner, Earl Johnson. They were called to Dean's apartment, and after their arrival, they notified the mobile crime unit and Area I homicide. Gunnell described Stanley's condition upon their arrival. Gunnell also indicated that while he and his partner were waiting for the mobile unit and Investigator Deloughery of Area I homicide, they questioned Jones, Henley, and Dean. They also searched the apartment and did not recover any alcoholic beverages, narcotics or weapons. Gunnell observed a hole in the front room screen door and another hole in a closet door of the front room. He also located the bullet's component parts in the closet door. Gunnell also identified the objects composing the one bullet, as well as the screen door to Dean's apartment, and photographs of Stanley's and Dean's apartment.

On cross-examination, Gunnell stated that he was never told by

Jones, Henley, or Dean that they were not sure that defendant was the man they had seen. On redirect examination, Gunnell stated that Henley, Jones, and Dean had provided him with defendant's name. On re-cross-examination Gunnell stated his report of the incident was accurate. He admitted that if he felt something he had heard was important, he would have included it in his report. After being shown his report, Gunnell admitted that he had not stated that anybody saw a gun, although he had included "handgun" under "circumstances." He acknowledged that the report had been prepared prior to finding the spent bullet.

Gunnell also stated his report accurately reflected that the witnesses to the shooting incident ran to the front room door and saw defendant running from the door. Gunnell also indicated that nowhere in his report had he noted that someone saw defendant standing at the door. Gunnell said the report he prepared was a summary of what the witnesses had told him.

Defense counsel then moved, outside the jury's presence, to exclude evidence of the Chicago police department's efforts to arrest defendant. Defense counsel argued that such evidence was not relevant to the issue of defendant's guilt or innocence and its admission would unfairly prejudice defendant. The trial court ruled that such evidence was admissible to corroborate the witnesses' testimony that they identified defendant as the shooter.

Officer Joseph Stine testified that on July 16, 1976, at approximately 5 a.m., he was working at a southside Chicago police station when defendant entered and asked if he could get transportation to a hospital. After Stine obtained defendant's name, he placed him under arrest for murder. On cross-examination, Stine acknowledged defendant had requested help for a stab wound.

Dr. Yuksel Konakci, a forensic pathologist, testified to the results of an autopsy he performed on Stanley. He observed two bullet wounds on the left and right sides of the neck where the bullet entered and exited. Konakci determined that Stanley's death was due to the bullet wound of the neck and the consequent laceration of the larynx. Konakci drew a blood sample from Stanley for a toxicology report. He did not perform the test himself but he indicated that the report disclosed Stanley's blood was negative for alcohol, narcotics, and tranquilizers.

James Henley, who described himself as a friend of Stanley's for five to six years, was called as a State's witness. He testified that on July 15, 1976, he was with Jones, Dean, and Stanley sitting on some benches outside their apartment buildings. Dean mentioned to Henley, Jones, and Stanley that defendant owed her money for license plates she had purchased for his car. Dean then walked to the parking lot and knocked

out the windshield of defendant's car. From the second floor of a building, Henley heard a man's voice saying "he was going to kick her ass."

Henley further stated defendant then came downstairs and, while defendant was 15 to 20 feet away from the benches, defendant exchanged words with Stanley. They began to "throw punches" and Henley then pulled Stanley away from defendant. Defendant left saying he would "take no ass-kicking. He was going to get his pistol."

Defendant's wife had a knife and began fighting with Dean. After defendant's wife lost the knife, she went upstairs. Defendant, carrying a stick, returned and started to struggle with Stanley. Henley called Stanley and Stanley walked towards Henley and defendant then went back upstairs.

Henley also testified that he, Jones, Stanley, and Dean then went to Henley's apartment to get a deck of cards. They then walked over to Dean's apartment. Jones, Dean, and Henley sat at the table in the kitchen while Stanley went towards the back of the apartment to get another chair. As he returned, Henley heard a shot and saw Stanley fall into the living room. Dean, Stanley, and Henley ran to the door. Through the screen door, Henley saw defendant running away from the door. Henley identified defendant as the man he had seen running from Dean's screen door.

On cross-examination, Henley denied he was aware that Dean had been indicted for perjury. Henley admitted he had moved once in mid-September 1976 and that he had not notified the State because he did not know how to reach the State's office. Henley further denied that there were numerous people sitting outside the apartment building during the time defendant and Stanley fought. Henley restated his testimony on direct examination regarding the first fight between defendant and Stanley. He asserted he never said that he, Jones, Stanley, or Dean had been "getting high" on the night of the incident.

According to Henley, when defendant returned with a stick, he pointed the stick at Stanley, but did not hit him with it. Henley did not see defendant get stabbed. He also had not observed Dean or Stanley with a knife. He asserted that defendant's wife was the only person he saw with a knife. Henley also stated that as far as he could tell, no one who was sitting at the kitchen table in Dean's apartment could see the screen door.

Henley identified a diagram of Dean's apartment which he had drawn during an interview with defense counsel and Rozelle Conyers, a law student who was assisting defense counsel. Henley admitted the diagram showed that no one seated at the kitchen table could have seen outside the kitchen door to the front room door. Henley further stated that after he drew the diagram, Jones entered the apartment and looked

at the diagram. Henley denied that Jones said defense counsel had drawn the diagram. He admitted, however, that Jones told him he did not have to say anything else to defense counsel.

Henley asserted that the diagram accurately represented where he, Dean, and Jones were sitting when they heard the gun fire. He admitted the diagram showed he was closest to the screen door and Jones was furthest away from the door. When Henley heard the shot, he saw Stanley standing in the middle of the living room, holding a chair. Henley stood up when he heard the gunshot, but he was the second person to the screen door. He denied ever making a contrary statement.

Upon further questioning, Henley acknowledged a document signed by him stating he was the first person to the door. The statement also reported that he, Jones, Stanley, and Dean were "getting high" when the fight between defendant and Stanley occurred. Although Henley denied he had said this, he admitted he had written the statement.

Henley also testified that when he reached the screen door, he saw the side of a man's face. He denied ever making a contrary statement or stating he had seen the back part of a man's head and body running through the doors that led to the elevators near Dean's apartment. He also denied ever stating that he assumed the man was defendant because earlier defendant had been fighting with Stanley. He, however, did admit that he wrote a statement which indicated he had seen only the back of a man's head and body as he ran and he knew it was defendant because of defendant's prior fight with Stanley. Henley asserted that when he reached the screen door, he saw defendant running away. He did not see defendant standing there for a minute or two.

On redirect examination, Henley testified he told the police defendant was the person he saw outside the screen door. He also had told defense counsel and Conyers that he saw defendant outside the screen door after the shooting. Henley further explained that the week before the trial began, he was with defense counsel's investigator Rene Brown when Henley wrote the statements contained in the document. Brown had come to Henley's home and invited him out for a drink. They went to Reese's Lounge and Henley had seven rum and cokes. Brown paid for the drinks. Henley did not know where Brown got the money for the drinks. Henley did know that Brown worked for defense counsel as an investigator.

Henley further testified that he and Brown first talked about women, then other subjects. Brown brought up the case and attempted to convince Henley that defendant had not killed Stanley. He also attempted to persuade Henley not to testify. Brown told Henley "how the white man be messing over the brothers in the jail and things like that there." After they left the lounge at 1 a.m., they went to a restaurant. Brown had paper

and pen and he took Henley's statement. A waiter spilled coffee on the paper and Brown asked Henley to rewrite the statement while Brown went to the washroom. Henley asserted he was intoxicated when he wrote the statement.

On re-cross-examination, Henley admitted he was testifying under a subpoena. Henley also indicated he was not forced to go with Brown to the lounge or to drink with Brown. Henley admitted he agreed with Brown's conversation about the jail conditions, but that parts of the statement he gave to Brown were untrue. Henley estimated that it was approximately 1:20 a.m. when Brown took his statement in the restaurant. He also asserted he remembered clearly the events of the evening, although he was intoxicated.

Officer Earl Johnson testified that when he arrived at Dean's apartment, he saw Stanley lying on the floor in a pool of blood. He spoke with Henley, Dean, and Jones and asked them for the names of anyone they suspected of doing the shooting. Johnson further asserted that based on the information received, he left and proceeded to another apartment building. He called other police units and, with the assistance of a Chicago fire department field lieutenant, he gained entry into the apartment. No one was in the apartment.

Johnson also testified that Dean's screen door had a hole in the screen. After being informed that Stanley was standing near a closet door when the gun shot was heard, Johnson went to the closet door and observed a hole in it. His partner, Gunnell, recovered bullet fragments from the closet door. Johnson also stated that the bullet holes in both the screen and closet doors were consistent with the witnesses' information as to where Stanley was standing when the gun was fired.

Defense counsel indicated to the trial court that for witness scheduling purposes he would call Chicago police officer McNichols to testify as a defense witness. Upon the State's inquiry, defense counsel explained McNichols' testimony would establish Dean's bias against defendant. The State informed counsel that it no longer intended to call Dean as a witness and then asked defense counsel how he would impeach the testimony of Dean if Dean were called as the defense's own witness.

The State argued that McNichols' testimony would be inadmissible if Dean did not testify. Defense counsel responded he had done everything possible to obtain her presence in court and that he would also subpoena her. The State then argued that even if Dean testified, the officer's impeachment testimony would be inadmissible. The court postponed any ruling and ordered defense counsel to obtain Dean's presence at trial.

The parties then entered into a stipulation relating to the testimony of Chicago police officer Smith, an expert firearms examiner who

determined that bullet fragments recovered from Dean's closet door formed one bullet. The State then rested.

The defense first called Rozelle Conyers, a law student, as a witness. Conyers testified she had a summer job with the Woodlawn Criminal Defense Consortium. At approximately 2 p.m. or 3 p.m. on September 17, 1976, she accompanied defense counsel to Jones' apartment. When they arrived, Henley was there. Conyers took notes as the case was discussed. Henley stated that on the night of the incident, he saw a man going away from Dean's apartment. Henley did not say he saw the man's face.

Conyers further stated that Henley then drew a diagram of Dean's apartment as it appeared on the date of the shooting. Jones then entered the apartment and asked who Conyers was. After defense counsel introduced her as a law student, Jones asked Henley what he was doing. Henley responded that he was discussing the case. When Jones saw the diagram, she asked whether defense counsel had drawn it. Henley responded that he himself had drawn it. Conyers also asserted that Jones angrily told Henley he did not have to say anything. Henley then said he would not talk about the shooting anymore. Jones indicated she wanted defense counsel and Conyers to leave and they did. On cross-examination, Conyers admitted Henley identified defendant as the man he saw outside the screen door, running away from Dean's apartment.

The defense next called Rene Brown, an investigator for the Woodlawn Criminal Defense Consortium. He testified that for some 20 minutes on August 26, 1976, he interviewed Henley concerning defendant's case. At this time, Henley told Brown that Henley believed defendant shot Stanley because of the prior fight between Stanley and defendant. Henley, however, also told Brown he had not seen the face of the man who had run away from Dean's apartment after the shooting incident. Brown further asserted that sometime just before the trial was to begin, Brown went to Henley's home. Henley suggested they talk at Henrici's Lounge. At Henrici's they talked for approximately 1½ hours about Henley's prior arrests. They also discussed the jail conditions.

Brown denied that he told Henley not to come to court. Brown stated Henley told him he would prefer not to appear in court. Brown also asserted that while they were in the lounge, they both had two drinks. During this time, Henley told Brown he was the first person to reach the door after the shot was fired. When he reached the door, he saw the back of a person's head and part of a body running towards the elevators.

Brown further testified that he and Henley left the lounge at 7:30 p.m. and at 7:35 p.m., they arrived at a restaurant and remained there approximately 15 minutes. They drank coffee and Henley gave Brown a statement which Brown reduced to writing. Henley later read and signed

the written statement. Henley then asked Brown to return with him to the lounge. They did return and remained there for two hours. During this time they each had two drinks. Henley asked Brown to pay for his drinks, which he did.

Brown then asserted that Henley suggested they go to the H&H restaurant for coffee. While they were there, a waiter spilled water over the written statement which had been placed on the table. Brown was upset and told the waiter this document might be used in court. Henley then told Brown he wanted to write the statement. Brown gave Henley some paper and pen and then went to the restroom.

Brown identified Henley's written statement at trial and testified that it appeared legible. The trial court sustained the State's objection to defense counsel's attempt to question Brown as to whether Henley's handwriting appeared jagged or whether any words were crossed out. Brown then testified that when he observed Henley on the night Henley wrote the statement, Henley's behavior did not seem unusual nor did Henley appear to be drunk.

The defense next called Reverend Darryl Perkins, who testified he was working as a waiter at the H&H restaurant on the night Brown was there with another man. Brown and his companion each had a cup of coffee and remained in the restaurant 15 to 20 minutes. Perkins asserted he spilled water on a tablet that Brown had on the table. Brown was upset and told him the paper was important. Perkins further asserted that neither Brown nor Henley appeared to be intoxicated, although Perkins had no personal knowledge of what they had to drink before arriving at the restaurant.

Perkins also stated he had observed Brown's companion rewriting the contents of the damaged paper. No one assisted the writer. Perkins also denied any prior acquaintance with Brown.

Willie Wright, a friend of defendant for approximately three to four years, testified that on July 15, 1976, late in the evening, he saw a crowd of 25 to 35 people watching a fight between defendant and Stanley. Wright observed another man trying to "get up on" defendant. Wright also saw a man pass a knife to the man with whom defendant was fighting. Although Wright did not actually see the man with the knife thrust the knife, he did hear someone say, "He's hurt, why don't you leave him alone?"

Wright further stated that defendant's wife then asked defendant to leave and the people watching said, "See, he's hurt." While defendant was attempting to leave, the two men continued to pull him back towards them. Wright then left the area.

Eugene Lawson, defendant's brother, testified that in the early morning on July 16, 1976, he received a telephone call from the Chicago police who informed him that they were trying to locate defendant.

Lawson located defendant at a friend's home and told defendant he was wanted by the police for murder. He also told defendant to turn himself in to the police.

Out of the presence of the jury, defense counsel then informed the court that he intended to call Dean as a court's witness but that she had indicated she would invoke the fifth amendment (U.S. Const., amend. V). A voir dire examination of Dean was conducted and Dean asserted she would not testify but then stated:

> "Dean: I will testify under behalf of my boyfriend getting killed in my apartment. I can't testify on his behalf.
>
>       ❁ ❁ ❁
>
> Court: In whose behalf do you intend to testify?
>
> Dean: The State's more or less. We were in court a while back and somehow or another I got indictment on me [sic] and I'm going to court for that now. Mr. Axelrod, he subpoenaed me to court and I didn't know at the time that I was a witness on his behalf until after everything was over with and then warrant was issued out on me. I told, October 21, 1976, June 10th I was arrested, for indictment of perjury which Axelrod tells me I was to get up there and tell what happened, I wouldn't go to jail because I was six months pregnant and had three kids."[1]

The court then appointed counsel for Dean. The State thereupon informed the court that it would grant Dean use immunity to avoid the possibility of Dean invoking the privilege against self incrimination before the trial jury. The State also indicated it wanted to avoid the possibility of Dean's bond hearing testimony, exculpating defendant, being admitted into evidence, if she was unavailable as a witness.

Defense counsel then argued his motion to call Dean as a court's witness asserting that: (1) neither side could vouch for Dean's veracity since she had perjured herself at the previous grand jury or bond application hearings; (2) her testimony related to direct issues in the case and she was a material witness; and (3) her testimony was necessary to prevent a miscarriage of justice. The trial court then ordered defendant to conduct voir dire examination of Dean to eliminate the possibility of "surprise," although defense counsel argued surprise was a foundational requirement to call a witness as a hostile witness, not a court's witness.

Again, outside the presence of the jury, and in connection with her voir dire, Dean testified that on the evening of July 15, 1976, she was sitting with Jones outside their apartment building. Stanley and Henley were upstairs for about an hour prior to joining them. There were a

---

[1] Before the grand jury, Dean testified that after the shooting she had seen defendant outside her screen door. At defendant's bond application hearing, she testified she had lied and had not seen defendant outside her door.

number of people near the building. Henley and Stanley asked Jones if her sister's boyfriend still had a shotgun and she answered no. Dean then threw a brick at defendant's car windshield. Dean observed defendant alone, exiting from a building.

The court then directed Dean to tell, in her own words, the events of the evening. Dean asserted defendant and Stanley struggled until a man from the first floor told them to get away from his apartment window. Defendant then ran to his friend's house saying he would shoot or kill someone and defendant then returned, swinging a two-by-four board. Stanley and Henley approached defendant and Stanley stabbed defendant in the back. Defendant ran to a building where a police car was parked, but it was empty. He then ran to another building. Henley, Jones, Dean, and Stanley then went directly to Dean's apartment to play cards.

Dean further asserted that she and Stanley went towards the back of Dean's apartment to get chairs. Stanley went into the bathroom before returning to the front. As he got near the front closet door, a gun was fired. Dean ran to the front room door and saw a bullet hole in the screen door. She did not see anyone outside the screen door but she heard the hallway door close. She asserted she was the first person to the door. She did not know Stanley had been shot. Jones and Henley then said Stanley was shot. Henley followed her about 10 minutes or 15 minutes later "at most." Henley then ran to the end of the porch to see if he could see anybody running.

Dean also testified that Henley told her and Jones that they should tell the police they saw defendant with a pistol in his hand outside the screen door. After they told this to the police, Dean said she was afraid to tell them she had lied and she therefore persisted in her story before the grand jury that after the shooting she saw defendant with a gun in his hand standing outside the door.

After Dean was excused, defense counsel renewed his motion to call Dean as a court's witness since he could not, in good faith, vouch for her credibility. The State argued Dean was not a hostile witness since Dean's testimony supported defendant's theory of the case that defendant had been falsely accused. The court denied the motion and reserved ruling on whether Dean could be examined as to the grant of immunity.

Defense counsel then called Dean as a witness for the defendant. In the presence of the jury, Dean testified she previously had lived with defendant and had one child with him. On the day of the shooting, she was living with Stanley. Dean repeated her prior voir dire testimony, but indicated additionally that she and defendant's wife also fought prior to the shooting incident. Dean stated that Jones helped her take away a knife from defendant's wife. Dean then threw the knife to the ground. Dean

contended that defendant came out of a building and was the one who began fighting with Stanley.

Dean repeated her voir dire testimony concerning the fight between defendant and Stanley and also stated that after she, Jones, Stanley, and Henley went to her apartment to play cards, she and Stanley went to the back of the apartment to get some chairs. Before returning to the front, Stanley stopped in the bathroom. As he returned, he passed Dean's closet door and a gun was fired. Dean ran to the door, saw a hole in the screen, but did not see anyone outside the door. Henley came to the door 15 minutes later.

Dean further stated that she, Jones, and Henley agreed to tell the police they saw defendant with a gun outside the screen door. Dean again explained that she had lied to the grand jury when she testified that immediately after the shooting she saw defendant holding a gun.

Defense counsel requested a side bar and again asked the court if he could examine Dean as to the State's grant of immunity. The court reserved ruling. Defense counsel continued questioning Dean. Dean revealed she lived with defendant from 1973 to 1974 and for a short time in the late part of 1975. Defendant then returned to live with his wife. Dean denied she was angry because defendant had reconciled with his wife. After examining a prior statement she had made, Dean insisted she was not really angry with defendant for reconciling with his wife. When defense counsel attempted to impeach her testimony by questioning her about an incident with defendant's car on April 3, 1976, the trial court sustained the State's objection.

On cross-examination, the State questioned Dean with reference to the statements she made to the police officers who arrived on the scene after the shooting and the statements she later made at the police station. Dean admitted she had told the police that she saw defendant standing outside the screen door. Defense counsel objected to this line of questioning, contending that the State had failed to lay a proper foundation for impeachment in not asking Dean whether she had made a contrary statement and allowing her to answer before reading her prior inconsistent statement to the jury. The State was allowed to question Dean by reading a statement which she gave at the police station. The statement reported that she had identified defendant as the man with a gun standing outside her screen door.

The State also questioned Dean as to whether she remembered testifying before the grand jury. After she responded affirmatively, the State read her grand jury testimony, which identified defendant as the man outside her screen door. Dean was then asked whether she had made the statement. Dean again responded affirmatively. The State asked Dean

whether she remembered testifying on September 8, 1976, at defendant's bond hearing. After she said yes, the State read her testimony that she only saw a light-skinned man outside the door and he was not defendant. Dean admitted she had so testified. The State then asked whether Dean had seen defense counsel prior to testifying at the bond hearing. Defense counsel's objection was sustained and the assistant state's attorney withdrew the question.

On redirect examination, defense counsel asked Dean whether she was testifying under a grant of immunity. The State's objection was sustained. During the subsequent side bar, the court denied defense counsel's request to ask Dean whether she was testifying under a grant of immunity.

Dean then requested to speak with the trial judge in chambers. Outside the presence of the jury, the court instructed Dean to repeat, under oath, the statements she had made in chambers. Dean testified her neighbor Denise Reed told Dean and a defense investigator that on the night of the shooting, Reed saw defendant and a man named Tito outside Dean's door.

Dean also asserted that she had spoken with defendant prior to the bond hearing. At that time, defendant told her his lawyer wanted him to convince Dean to testify that she had seen a tall light-skinned person at the door. The trial judge asked Dean if he previously had asked her in chambers if defendant had told her he was also at the door at the time the shot was fired. Dean said she had told the court the defendant had admitted that to her.

The State then asked Dean if anyone had offered her money to testify. Dean responded that she had received a letter written on yellow paper which previously had been placed under her apartment door. The letter allegedly was from defense counsel. Dean also asserted defense counsel came to her apartment while she was there with Jones, but he left after she threatened to call the police and told him she had nothing to say to him.

Dean also stated that Henley told her that he and Jones had received money from defense counsel "to move from their apartment" and not appear in court. Dean denied, however, that she had been offered any money for her testimony, but she stated she had been threatened to say she did not see defendant. She also asserted that someone pulled all the tires off her car. The court then excused Dean as a witness but ordered her to return the following day.

On the following day, the trial judge reversed his prior ruling and stated that either party could recall Dean as a witness to show she was testifying under a grant of immunity and that she had been indicted for perjury. Neither party recalled her as a witness.

The defense next called Sergeant John Deloughery, a Chicago police officer. He testified that on July 16, 1976, he interviewed Dean, Jones, and Henley at Dean's apartment. Jones did not tell him that she saw defendant with a gun. On cross-examination, Deloughery asserted that Dean did tell him she saw defendant outside her screen door after the shooting and that defendant was holding a gun. Deloughery then testified as to his efforts to find defendant.

The trial court refused to admit Officer McNichols' testimony concerning a fight between defendant and Dean three months prior to the shooting. At that time, Dean allegedly threw a brick through defendant's car window. McNichols arrested Dean and she tried to persuade him to arrest defendant for a traffic citation. Defense counsel argued that the testimony should be admitted since it tended to show that Dean was angry with defendant and therefore had a motive to falsely accuse him of the shooting of Stanley.

The trial court also refused to allow the jury to see Henley's handwritten statement to show the handwriting was not that of an intoxicated person. The defense then rested. There was no rebuttal by the State.

After the presentation of instructions, the jury deliberated and returned a guilty verdict. Defense counsel thereupon orally moved to present post-trial motions. On the State's objection, the court ordered that the motion be presented in writing, and the court continued the cause for post-trial motions and sentencing. After several other continuances, defense counsel moved to withdraw as counsel for defendant asserting he was involved in a conflict of interest situation. Defense counsel contended that he was placed in that position because he feared criminal investigation by the State since during trial he had been accused of suborning perjury and unlawfully communicating with State's witnesses. Since prior to trial the State had informed him he was being investigated, the witnesses' accusations during trial influenced his decision not to call certain witnesses who also might accuse him. His fear stemmed from the fact that prior to trial the State had informed him he was the subject of a grand jury investigation for suborning perjury in the instant action. These circumstances forced defense counsel to defend his own interest at the expense of defending the defendant's case. Defense counsel's motion was denied, and the court ordered defense counsel to present post-trial motions and to proceed with the sentencing hearing.

OPINION

I

Defendant first contends he was not proved guilty beyond a reasonable doubt of the charge of murder because the testimony of the

State's witnesses was conflicting and was contradictory to the testimony of the defense witness. We disagree.

Although neither Henley nor Jones actually observed defendant fire the gun at Stanley, that fact alone does not invalidate defendant's conviction. A conviction may be sustained upon circumstantial evidence as well as direct evidence. *People v. Williams* (1977), 66 Ill. 2d 478, 363 N.E.2d 801; *People v. Russell* (1959), 17 Ill. 2d 328, 161 N.E.2d 309.

In *People v. Williams* (1977), 66 Ill. 2d 478, 484-85, 363 N.E.2d 801, 804, the supreme court held:

"'[T]he proof of circumstances must be of a conclusive nature and tendency leading, on the whole, to a satisfactory conclusion and producing a reasonable and moral certainty that the accused and no one else committed the crime. [Citations.] The jury need not be satisfied beyond a reasonable doubt as to each link in the chain of circumstances relied upon to establish guilt, but it is sufficient if all the evidence, taken together, satisfies the jury beyond a reasonable doubt of the accused's guilt.' Proof of guilt beyond a reasonable doubt does not require proof beyond any possibility of a doubt. [Citations.]'"

In our view, the record contains ample evidence to support defendant's conviction of murder beyond a reasonable doubt. Jones and Henley both identified defendant as the man outside Dean's screen door immediately after the shooting. Both Jones and Henley testified that immediately after the shot was fired, they ran to the screen door and saw defendant. Jones arrived at the door first and saw defendant with a gun; Henley saw defendant run away from the door.

Both Jones and Henley observed defendant under circumstances which enabled them to positively identify defendant. There was an outside light on the porch providing illumination, and they observed defendant for a sufficient amount of time to allow a positive identification. (See, *e.g., People v. Mendoza* (1978), 62 Ill. App. 3d 609, 378 N.E.2d 1318; *People v. Brown* (1977), 50 Ill. App. 3d 348, 365 N.E.2d 907.) Prior to the shooting, they also observed defendant in the areaway of the nearby buildings. This too strengthens their recognition of defendant and their subsequent identification of him. *People v. Horobecki* (1977), 48 Ill. App. 3d 598, 363 N.E.2d 1; see also *People v. Fabian* (1976), 42 Ill. App. 3d 934, 356 N.E.2d 982; *People v. Belk* (1972), 6 Ill. App. 3d 422, 286 N.E.2d 17.

Defendant argues that the identification testimony of Jones and Henley is contradictory and inconsistent and, therefore, legally insufficient to sustain his conviction. Specifically, defendant compares Jones' testimony that she saw defendant standing at the door for a "minute or two" with Henley's testimony that he saw the side of

defendant's face as defendant ran away. Defendant concludes from this comparison that the testimony is conflicting.

A closer examination of the testimony, however, reveals that Jones' identification testimony is consistent with Henley's identification testimony. Both Henley and Jones testified that Jones was the first person to arrive at the door. Henley arrived after Jones and saw the side of defendant's face as he ran away. Jones was not certain of the time she observed defendant at the door; she equivocally estimated that defendant stood at the door "about, around one or two minutes, just until he turned around * * * something like that." Whether defendant stood at the door one or two minutes or a few seconds was incidental to the central issue of whether Jones had an adequate opportunity to view defendant standing at the door after the shot was fired.

We believe that the other inconsistencies singled out by defendant are not so great as to raise a reasonable doubt of defendant's guilt. For example, whether Jones, Stanley, Henley and Dean were in the courtyard 10 minutes or 30 minutes or whether Henley was 40 to 45 feet or 15 feet from defendant when he returned with a board is collateral to the issue of whether Jones and Henley clearly observed defendant standing outside Dean's door after the shot was fired and were able to identify him.

Further, the State's evidence established that a gun was fired through the screen door and that the bullet struck Stanley when he was standing near a closet towards the rear of Dean's apartment. This evidence further tends to corroborate the testimony of Jones and Henley of the events which took place in Dean's apartment prior to the shooting.

Defendant, in his argument that the State's evidence was legally insufficient to sustain his conviction, points to the trial testimony of Dean which directly contradicts the testimony of Jones and Henley. Dean testified that she, Jones, and Henley agreed to identify defendant as the shooter, although none of them had actually seen defendant at the door. Dean, however, had made several prior inconsistent statements. The jury reasonably could have concluded that her testimony was incredible and beyond belief.

Similarly, whether Henley was intoxicated when he made a statement inconsistent with his testimony at trial was an issue of fact for the jury to resolve. To the extent that the witnesses' testimony at trial varied, there existed a question of credibility which the jury ultimately resolved in favor of the State. As the supreme court noted in *People v. Yarbrough* (1977), 67 Ill. 2d 222, 227, 367 N.E.2d 666, 668, "[c]onflicts in testimony are certainly not uncommon. The resolution of questions of fact is for the jury. The credibility of witnesses is for the jury to assess, * * *."

In the instant case, the jury apparently preferred to believe the

testimony of Jones and Henley to that of Dean who had been seriously impeached. A court of review will not set aside a jury's verdict unless the evidence presented at trial is so improbable as to raise a reasonable doubt of guilt. *People v. Yarbrough* (1977), 67 Ill. 2d 222, 367 N.E.2d 666.

Defendant, relying on *People v. Hister* (1975), 60 Ill. 2d 567, 328 N.E.2d 531, argues that the evidence is so improbable that his conviction cannot stand. *Hister*, however, is distinguishable from the case at bar. In *Hister*, the *only* eyewitness testified to one version of events and then contradicted himself; his testimony on direct examination became hesitant, but with the "help of leading questions," he was able to recall seeing the victim shot by the defendant. On cross-examination, however, he admitted he had not actually seen the defendant; he had only seen an arm firing a gun. In marked contrast, both Henley and Jones testified on direct and cross-examination that they saw defendant at the door almost immediately after the gun was fired.

Further, we agree with the State that, notwithstanding the identification testimony, the circumstantial evidence presented at trial was sufficient to convict defendant. At the time of the shooting, Stanley was living with Dean. Dean had previously lived with defendant who was the father of one of her children. Prior to the shooting, defendant and Stanley were engaged in a physical fight. Defendant left, stating he would get his gun; defendant returned with a board and again "struggled" with Stanley; shortly thereafter, Stanley was shot. This uncontradicted testimony circumstantially established defendant's motive for the ultimate shooting and placed defendant at the scene of the incident.

From our review of the record, we conclude the evidence presented was sufficient to prove defendant guilty beyond a reasonable doubt of murder.

## II

Defendant next contends the testimony of Officers Johnson and Deloughery regarding their efforts to locate defendant was irrelevant and prejudicial. Defendant argues that this testimony, which reported that police had entered defendant's apartment with the assistance of the fire department and had not found defendant there, inferred that defendant was consciously avoiding arrest. Defendant also contends that reversible error occurred when the trial court allowed Jones' testimony to be improperly rehabilitated with evidence of Jones' prior consistent statements.

■■ The State argues defendant has waived both these issues on appeal since he failed to include the errors in his written motion for a new trial. We agree.

It is apparent from the record that the State objected to defendant's

oral motion for a new trial and defendant's written post-trial motion did not specify these errors as grounds for a new trial. Thus, these issues, on appeal, are considered waived. (*People v. Precup* (1978), 73 Ill. 2d 7, 382 N.E.2d 227; *People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856.) The written motion, to be effective, must set forth, with adequate specificity, the errors relied upon for a new trial. (See, *e.g., People v. Nunez* (1974), 24 Ill. App. 3d 163, 320 N.E.2d 462.) Since this was not done, the defendant has waived the issues on appeal.

Further, we do not believe that these alleged errors deprived defendant of a fair and impartial trial which would invoke application of the plain error exception to the waiver rule (Ill. Rev. Stat. 1975, ch. 110A, par. 615); nor do we consider that the evidence presented at trial was "closely balanced," which also would avoid application of the waiver rule. *People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856.

### III

Defendant next contends reversible error occurred when he was improperly restricted in his efforts to present evidence relevant to the credibility of the witnesses. Dfendant's contention considers three separate attempts to admit evidence.

First, defendant argues that because Henley testified he was intoxicated while writing a statement he previously had given orally to defense counsel's investigator and the statement differed from Henley's trial testimony, defense counsel should have been allowed to (1) present his investigator's testimony that the handwritten statement did not contain any crossed-out words or appear jagged; and (2) admit the written statement into evidence so that the jury could view the writing and determine whether Henley was intoxicated.

■■ In our view, any error that may have occurred by the court's refusal to admit this evidence was rendered harmless by the testimony of Brown and Perkins who both observed Henley at the time he wrote the statement and testified at trial that Henley did not appear intoxicated. Since lay persons may express their opinion on the question of intoxication if the opinion is based on their personal observation of and experience with intoxication (*People v. Reeder* (1971), 2 Ill. App. 3d 471, 276 N.E.2d 768), the jury properly heard the testimony of Brown and Perkins that Henley did not appear intoxicated. This evidence discredited Henley's assertion that he was intoxicated when he wrote the statement and thus defendant was not prejudiced by the court's refusal to allow the admission of evidence including the written statement itself to disclose the appearance of Henley's handwriting so as to contradict his claim of intoxication. See generally McCormick, Evidence §§11, 47 (2d ed. 1972).

Second, defendant contends the court erred in refusing to allow the

testimony of Officer McNichols, who had arrested Dean in April 1976, after she threw a brick at defendant's car and disobeyed McNichols' order to stop fighting with defendant. At the time of Dean's arrest, she attempted to persuade McNichols to arrest defendant for a traffic citation. Defendant argues that this evidence was admissible to show Dean's bias or motive to join in an attempt to frame defendant.

This evidence, defendant asserts, could have allowed him to rebut the State's argument to the jury that Dean changed her trial testimony (exculpating defendant) from her grand jury testimony (inculpating defendant) because she was biased in favor of defendant. Defendant also argues that since the State was allowed to elicit evidence that Dean had lived with defendant and had a child with him and argue Dean was biased in favor of defendant, he should have been allowed to counter with evidence of Dean's prior altercation to show Dean actually was biased against defendant.

■■ We are aware that the partiality of a witness " '* * * is always relevant as discrediting the witness and affect[ing] the weight of his testimony.' [Citation.]" (*Alaska v. Davis* (1973), 415 US. 308, 316, 39 L. Ed. 2d 347, 354, 94 S. Ct. 1105, 1110) and that if the witness denies the facts claimed to show bias, other witnesses may be called to prove facts showing bias. (McCormick, Evidence §40, at 81 (2d ed. 1972).) Dean, however, was called as a defense witness and thus the defense vouched for her credibility and could not impeach her testimony (*People v. Kelly* (1976), 39 Ill. App. 3d 190, 350 N.E.2d 163; *People v. Boyd* (1974), 22 Ill. App. 3d 1010, 318 N.E.2d 212)' with evidence of bias against defendant.

We also are aware of defense counsel's predicament at trial: since the court refused to call Dean as a court's witness, defendant was thereby precluded from impeaching Dean by inquiring into Dean's previous altercation with defendant which resulted in her arrest. (See *People v. Chitwood* (1976), 36 Ill. App. 3d 1017, 344 N.E.2d 611.) This inquiry was relevant to establish Dean's alleged motive to lie to the grand jury (See *People v. Coles* (1979), 74 Ill. 2d 393, 385 N.E.2d 694). If Dean denied the fact of the altercation, defendant could have impeached this testimony with McNichols' testimony. (See McCormick, Evidence §40, at 81 (2d ed. 1972).) We do not, however, believe that this error resulted in "manifest prejudice" to defendant requiring reversal as in *People v. Coles* (1979), 74 Ill. 2d 393, 385 N.E.2d 694. See also *People v. Gaskins* (1980), 82 Ill. App. 3d 37, 402 N.E.2d 258.

In *Coles,* the supreme court reversed defendant's conviction because the trial court had refused to allow defendant to cross-examine the chief prosecution witness and sole eyewitness to the robbery as to her bias. The defense counsel was precluded from any inquiry into an earlier beating

the witness had received from her husband as a result of defendant's having told him that she was involved in an extramarital affair.

Here, the State's two witnesses, Henley and Jones, testified that on the night of the incident prior to the shooting, Dean threw a brick at defendant's car and fought with defendant's wife. From this testimony, the jury could have inferred that Dean had been angry with defendant and, therefore, fabricated her grand jury testimony that defendant was outside her screen door immediately after the shot was fired.

Further, it cannot be argued that Dean provided the most damaging evidence against defendant, so that exclusion of this evidence was prejudicial (*People v. Coles* (1979), 74 Ill. 2d 393, 385 N.E.2d 694), since Dean's trial testimony supported defendant's theory that he had been "framed." Moreover, both Henley and Jones testified at trial that they saw defendant outside Dean's screen door immediately after the shooting. Their trial testimony was damaging to defendant; Dean's trial testimony was favorable to defendant.

Accordingly, we find that any error which may have occurred as noted above was harmless, since it did not result in substantial prejudice to defendant.

■ Third, defendant also argues that he was prejudiced when the court sustained the State's objection to defendant's efforts to elicit the fact that Dean had been indicted for perjury and was testifying pursuant to a grant of immunity. The record, however, indicates that after Dean was excused, the trial court ruled either party could call her as a witness to elicit the fact of her indictment and grant of immunity, yet defendant did not do so. Since defense counsel could have recalled Dean to testify to these facts, but chose not to do so, he failed to avail himself of the opportunity to present this evidence to the jury and cannot now be heard to claim prejudicial error.

## IV

Defendant next contends that plain error occurred and that he was denied a fair trial when the State adduced detailed evidence of Dean's prior inconsistent statements which incriminated defendant. Defendant argues that he was prejudiced by the error since the jurors were told only to consider prior inconsistent statements in determining the weight to be given that witness' testimony (Illinois Pattern Instructions, Criminal, No. 3.11 (1968)), and were not instructed that such statements could not be considered as substantive evidence of defendant's guilt.

■ While evidence of prior inconsistent statements by witnesses is admissible to impeach their credibility (*People v. Morgan* (1963), 28 Ill. 2d 55, 190 N.E.2d 755), "* * * prior self contradictions are not to be

treated as having any substantive or independent testimonial value. [Citations.]" *People v. Paradise* (1964), 30 Ill. 2d 381, 384, 196 N.E.2d 689, 690; *People v. Spicer* (1979), 79 Ill. 2d 173, 180, 402 N.E.2d 169, 173.

The Illinois courts, cognizant of the necessity of contradictory statements for impeachment, also consistently have recognized the danger that the jury may consider the out-of-court statement as substantive testimony. (*People v. Tate* (1964), 30 Ill. 2d 400, 197 N.E.2d 26; *People v. Paradise* (1964), 30 Ill. 2d 381, 196 N.E.2d 689.) Accordingly, to lessen the risk of this danger, the supreme court has required that the impeachment not be repetitious (*People v. Moses* (1957), 11 Ill. 2d 84, 142 N.E.2d 1; *People v. Paradise* (1964), 30 Ill. 2d 381, 196 N.E.2d 689) and that the jury be cautioned and instructed to limit its consideration of such evidence for its proper purpose. *People v. Tunstall* (1959), 17 Ill. 2d 160, 161 N.E.2d 300; *People v. Paradise* (1964), 30 Ill. 2d 381, 196 N.E.2d 689.

The record before us discloses that on cross-examination of Dean, the prosecutor delved with great detail into Dean's prior statement which incriminated defendant. Officer Deloughery also testified on cross-examination that Dean told him she had seen defendant outside the door. Here, Dean admitted that her prior statements to the police were inconsistent with her trial testimony. This admission seriously detracted from Dean's credibility as a witness and, thus, obviated the need for the admission of extrinsic evidence to establish Dean's lack of credibility. See, e.g., *People v. Moses* (1957), 11 Ill. 2d 84, 142 N.E.2d 1.

The State, however, endeavored to prove the substance of Dean's prior statement by the testimony of Officer Deloughery. This evidence, coupled with the detailed question and answer presentation of the statement to the jury, establishes a "thinly disguised effort by the State to impart substantive character" to Dean's prior inconsistent statements. *People v. Bailey* (1975), 60 Ill. 2d 37, 43, 322 N.E.2d 804, 808.

■■ Accordingly, it was error for the prosecutor to repetitiously present Dean's prior statements through detailed questions and answers and Officer Deloughery's testimony. See *People v. Robinson* (1977), 46 Ill. App. 3d 713, 361 N.E.2d 138; *People v. Fields* (1975), 31 Ill. App. 3d 458, 334 N.E.2d 752.

We do not believe, however, that the error requires reversal of defendant's conviction. Independent of Dean's statement, there was convincing evidence of defendant's guilt. (*Cf. People v. Spicer* (1979), 79 Ill. 2d 173, 402 N.E.2d 169.) Prior to the shooting, defendant had a fight with Stanley. Both Jones and Henley testified that after this fight, Stanley was shot while in Dean's apartment. Immediately after the shot was fired, they ran to the screen door and saw defendant. Thus, the content of Dean's statement virtually was the same as other competent evidence which had been admitted at trial. See *People v. Spicer* (1979), 79 Ill. 2d

173, 402 N.E.2d 169; *cf. People v. Gray* (1977), 47 Ill. App. 3d 1026, 365 N.E.2d 501.

*People v. Fields* (1975), 31 Ill. App. 3d 458, 334 N.E.2d 752, upon which defendant relies, is factually distinguishable from the instant case. There, the only evidence linking defendant to the crime was the written statement of an accomplice. That statement was used substantively at defendant's trial and therefore was inadmissible. See also *People v. Robinson* (1977), 46 Ill. App. 3d 713, 361 N.E.2d 138.

Since we have concluded that here, independent of Dean's statement, there existed competent evidence sufficient to prove defendant guilty beyond a reasonable doubt, it is difficult to see how the elimination of Dean's statement would have altered the jury's verdict. We find, therefore, that the trial error did not result in manifest prejudice to the defendant so as to necessitate a new trial.

## V

The defendant next contends the trial court erred in failing to call Dean as a court's witness. Defendant argues that since he was unable and unwilling to vouch for Dean's veracity, he should not have been compelled to call Dean as a defense witness. The decision to call a witness as a court's witness is within the discretion of the trial court (*People v. Henson* (1963), 29 Ill. 2d 210, 193 N.E.2d 777), and that decision will not be disturbed on appeal, absent an abuse of discretion. *People v. Robinson* (1974), 21 Ill. App. 3d 343, 315 N.E.2d 95; *People v. Stoudt* (1967), 90 Ill. App. 2d 140, 232 N.E.2d 800.

A witness may be made a court's witness and be subjected to cross-examination by either side when, for sufficient reason shown, his integrity or veracity is doubtful and neither side desires to vouch for his testimony. (*People v. McKee* (1968), 39 Ill. 2d 265, 235 N.E.2d 625.) A proper foundation also requires a showing that the testimony relates to direct issues in the case and is necessary to prevent a miscarriage of justice. *People v. Dennis* (1970), 47 Ill. 2d 120, 265 N.E.2d 385; *People v. McKee* (1968), 39 Ill. 2d 265, 235 N.E.2d 625; *People v. Siciliano* (1954), 4 Ill. 2d 581, 123 N.E.2d 725; *People v. Reddock* (1973), 13 Ill. App. 3d 296, 300 N.E.2d 31.

The record at bar discloses that Dean refused to testify but at the same time indicated she would testify in the State's behalf "more or less." Defense counsel informed the court of Dean's prior inconsistent statements and testimony. The court was aware of Dean's indictment for perjury. During voir dire, Dean admitted she lied to the police and the grand jury. The trial court again denied defense counsel's motion.

■ We believe defense counsel laid a proper foundation to show that neither side could vouch for Dean's veracity. (*People v. Robinson* (1974),

21 Ill. App. 3d 343, 215 N.E.2d 95.) The record reveals valid reasons for defendant's unwillingness to vouch for Dean's integrity and veracity. (*People v. Mostafa* (1971), 274 N.E.2d 846.) As in *People v. Mostafa*, the record here reveals that prior to trial Dean was listed as a possible State's witness. At defendant's bond hearing, Dean's testimony exculpated defendant which directly conflicted with her grand jury testimony. Dean was indicted for perjury and, at trial, invoked her privilege against self-incrimination. Thus, these facts provided a foundation to show that defense counsel could not vouch for Dean's veracity. The record also shows Dean's testimony related to defendant's guilt or innocence. Thus, defendant urges it was error and an abuse of discretion for the trial court to refuse defendant's request that Dean be called as a court's witness.

Defendant argues the error is not harmless since the State in its closing remarks argued to the jury that Dean was a defense witness and to find defendant not guilty, the jury had to believe Dean. We disagree. In defense counsel's closing remarks, defendant asserted that when Dean testified to the events which occurred in her apartment, "she [was] the only person who told you something which is at all believable." Indeed, Dean was the only witness whose testimony supported the defendant's theory that Dean, Jones, and Henley had falsely accused defendant.

■■ While we do not condone the remark of the State that the jury had to believe Dean to find defendant not guilty, we do not believe this remark, although improper, substantially prejudiced defendant. (*People v. Nilsson* (1970), 44 Ill. 2d 244, 255 N.E.2d 432.) We therefore find that the trial court's refusal to call Dean as a court's witness was harmless error.

## VI

Defendant next contends he was denied a fair trial when the prosecutor misstated the law and the facts to the jury in closing argument and the judge overruled defendant's objections, thereby "concur[ring] in the misstatements." The closing remarks which defendant objects to include the following:

> "Initially, I think that it's crystal clear at this time concerning the entire case and all the evidence that you have heard that as a matter of fact, George Lawson did shoot Lalice Stanley. In looking at all the circumstances of the case, including all of the testimony that you have heard from all of the various witnesses. There is a previous scuffle. The scuffle includes Lalice Stanley, Henley and the defendant, Lawson. That leads to the conclusion that Lawson, at that time, had a motive. A motive which cuts both ways. A motive to kill.
>
> Secondly, you have heard the testimony of Lenora Dean. She

had a child by the defendant. Lenora Dean was living with Lalice. That raises a second motive.

Defense Counsel: Objection.

The State: George Lawson—

The Court: Overruled.

The State: —had a dual motive to eliminate Stanley.

      \* \* \*

Look at the actual details of the way the killing went down. There was no robbery, no demand previously. No statements made. No apparent motive for Lalice Stanley to be shot to death.

      \* \* \*

Look at the screen. You will see that the—it has the—the mesh is bent in. This is the outside of the screen.

      \* \* \*

The victim was shot on the left side of his neck with a trajectory being horizontal, straight through his neck. And when you look at the photographs, you'll see that the bullet hole in the mirror on the door after the bullet passed through his neck and on the opposite side and lodged in the door is again this high.

The only conclusion you can draw is that the gunman stood outside of the screen, raised his arm and waited for one particular victim. Waited for one man. And it was an excellent shot. Picked him up, brought him along and when the man was just level with his gun, bang. One shot in the neck. No apparent motive. Only one person had motive to kill—

Defense Counsel: Objection.

The Court: Overruled.

The State: —the victim at that time, that being George Lawson. Was there any demand made, any entry made, any other person in the apartment injured. No. Clearly then, factually, circumstantially, Lawson did kill Stanley.

Defense Counsel: Objection.

The Court: Overruled."

In determining whether a closing argument is so prejudicial or inflammatory that a conviction must be reversed, the reviewing court should consider the record as a whole and the arguments in their entirety. (*People v. Hoggs* (1974), 17 Ill. App. 3d 67, 307 N.E.2d 800; see also *People v. Nemke* (1970), 46 Ill. 2d 49, 263 N.E.2d 97; *People v. Burnett* (1963), 27 Ill. 2d 510, 190 N.E.2d 338.) Only when the remarks result in substantial prejudice to the defendant is reversal required. *People v. Nilsson* (1970), 44 Ill. 2d 244, 255 N.E.2d 432.

A prosecuting attorney has the right to draw legitimate inferences

from facts and circumstances proved (*People v. Miller* (1958), 13 Ill. 2d 84, 148 N.E.2d 455) and motive is a proper subject of comment (*cf. People v. Nelson* (1975), 31 Ill. App. 3d 934, 335 N.E.2d 79).

Upon the record before us, it was within the proper bounds of debate for the prosecutor to comment that defendant was motivated to kill Stanley because of a prior fight with him. It was not proper, however, for the prosecutor to urge that *only* defendant had a motive to kill Stanley. The record clearly does not justify such an inference being drawn from the evidence.

While this comment was improper and the trial court should have sustained defendant's objection, we cannot say the comment was a material factor in defendant's conviction or that the judgment may have been different had the prosecutor refrained from making this comment. See *People v. Nicholls* (1969), 42 Ill. 2d 91, 245 N.E.2d 771; *People v. Whitley* (1977), 49 Ill. App. 3d 493, 364 N.E.2d 511; *People v. Hoggs* (1974), 17 Ill. App. 3d 67, 307 N.E.2d 800.

Defendant also argues that the State misled the jury as to the facts when the prosecutor successfully objected to the following closing remarks of defendant:

"Defense Counsel: There is a statement here by James Henley saying these people were getting high in the evening of July 15, 1976. Well, Dr. Konakci is an honest man. He says, yes, I got this toxicologist report, but I don't know what it measured. I don't know what the tests are. I don't know what drugs are involved.

The State: Objection, judge. That wasn't the testimony.

The Court: Sustained."

Dr. Konakci testified on direct examination that he submitted to the toxicology laboratory a specimen from Stanley, but he did not conduct the toxicology tests. On cross-examination, Konakci stated the report indicated the specimen was negative for alcohol, narcotics, and tranquilizers. He admitted he did not know whether the tests would have revealed whether Stanley had used marijuana. Konakci did not testify that he did not know what the test measured, but that his knowledge was based on the toxicologist's report, not from conducting the test. Thus, this portion of defense counsel's remarks was a misstatement of the testimony.

Defendant speculates that he was prejudiced by the court's ruling since the jury may have been led to believe that the toxicologist's report contradicted Henley's prior inconsistent statement that he, Jones, Dean, and Stanley were "getting high." This belief, defendant asserts, could have led the jury to conclude that defense counsel's investigator fabricated the statement and tricked Henley into copying the statement rather than concluding that Henley in fact made a prior inconsistent statement. We disagree.

Since both Henley and Jones denied that they were "getting high" prior to the fight between defendant and Stanley, there was conflicting evidence as to this fact independent of the closing remarks. This was for the jury to evaluate. Thus, we do not believe that any prejudice occurred when the court sustained the State's objection.

## VII

Defendant next contends that reversible error occurred when the State commented upon defendant's failure to present alibi witnesses. Defendant argues this comment infringed upon defendant's right to be presumed innocent since it inferred to the jury that defendant was required to produce witnesses to prove where he was at the time of the crime.

■■ While defendant has no duty to call anyone as a witness in his case and argument to a jury that defendant failed to call witnesses on his behalf is prejudicial (*People v. Rubin* (1937), 366 Ill. 195, 7 N.E.2d 890), if a defendant "injects into a case his activities with potential witnesses during a particular period of time ostensibly for the purpose of establishing an alibi * * *, his failure to produce such witnesses is a proper subject of comment on the part of the State. [Citations.]" *People v. Gray* (1964), 52 Ill. App. 2d 177, 190, 201 N.E.2d 756, 763.

■■ Since defendant did not "inject into [the] case his activities with potential witnesses during a particular time," the State's comment on his failure to produce alibi witnesses was error. We hold, however, that the error was harmless. *People v. Moore* (1973), 55 Ill. 2d 570, 304 N.E.2d 622.

In *Moore*, the supreme court recognized this type of prosecutorial comment was error, but held that it was not a significant factor in the jury's determination since there was substantial evidence of defendant's guilt. We conclude that the comment in this case was not a significant factor in the jury's determination "for to conclude that it was would require us to substantially disregard the testimony" of two witnesses who saw defendant immediately after the shooting. (*People v. Moore* (1973), 55 Ill. 2d 570, 577, 304 N.E.2d 622, 625.) In view of the evidence presented, we conclude that the error was harmless.

## VIII

Defendant next contends he was denied his sixth amendment (U. S. Const., amend. VI) right to effective assistance of counsel because a *per se* conflict of interest arose at trial when his attorney was accused of attempting to suborn perjury and unlawfully communicate with witnesses. We disagree.

The parties concur that a defendant's fundamental right to effective assistance of counsel entitles the person represented to the undivided

loyalty of counsel and requires that his attorney not represent conflicting interests or undertake the discharge of inconsistent duties. (*Glasser v. United States* (1941), 315 U.S. 60, 86 L. Ed. 680, 62 S. Ct. 457; *People v. Stoval* (1968), 40 Ill. 2d 109, 239 N.E.2d 441.) They disagree as to whether this case presents a *per se* conflict of interest.

The Illinois Supreme Court has considered the conflict of interest issue with some frequency and has established that where a potential conflict threatened the adequacy of representation at trial, reversal is necessary without any showing of actual prejudice. *People v. Coslet* (1977), 67 Ill. 2d 127, 364 N.E.2d 67.

As noted recently, in *People v. Fife* (1979), 76 Ill. 2d 418, 423, 392 N.E.2d 1345, 1347-48, "effective ' "* * * representation is lacking * * * if counsel, *unknown to the accused and without his knowledgeable assent*, is in a duplicitous position where his full talents * * * are hobbled or restrained by commitments to others." ' (Emphasis added.) (*People v. Stoval* (1968), 40 Ill. 2d 109, 112, 239 N.E.2d 441, 443.)"

The rationale underlying the *per se* conflict rule which is expressed repeatedly by the supreme court is concern for the possibility that an attorney might be subject to "subtle influences" which could be viewed as affecting the attorney's ability to defend the client in an "in depth and vigorous manner." (*People v. Kester* (1977), 66 Ill. 2d 162, 167, 361 N.E.2d 569, 572. (a court-appointed assistant public defender had appeared in the same proceeding as an assistant state's attorney); *People v. Fife* (1979), 76 Ill. 2d 418, 392 N.E.2d 1345 (defense attorney's employment with Attorney General's office would create the appearance of conflict when she would have to oppose the State in the criminal proceeding); *People v. Stoval* (1968), 40 Ill. 2d 109, 239 N.E.2d 441 (defense counsel was member of a law firm whose clients were the burglarized jewelry store and its owner).

■■ To establish a *per se* conflict of interest, defendant must show that his attorney had a commitment to some other person or cause adverse to defendant's interest. (*People v. Spicer* (1979), 79 Ill. 2d 173, 402 N.E.2d 169.) Contrary to the State's assertion, defendant need not show actual prejudice at trial but rather must allege facts which give rise to an "appearance of a conflict." *People v. Walton* (1979), 78 Ill. 2d 197, 200, 399 N.E.2d 588, 599.

■■ We do not believe that such a showing was made in the instant case. We do not believe that the appearance of a conflict of interest is raised automatically by virtue of a defense witness' accusations that defense counsel suborned perjury. (78 Ill. 2d 197, 200.) Almost three months subsequent to the jury's finding of guilt, defense counsel Axelrod, an attorney with the Cook County Criminal Defense Consortium, moved to withdraw as attorney of record. Cohn, the director of the Consortium,

argued that a conflict between Axelrod's interests and defendant's interests developed at trial because Axelrod feared he would be indicted for suborning perjury:

> "Based on statements made by the State's Attorneys who were trying the case that there had in fact been a grand jury investigation where Mr. Axelrod was told that he was the subject being investigated in that grand jury and although it appeared prior to trial that that had been resolved, during the course of the trial other matters came up which caused Axelrod to again fear that he would be indicted for suborning perjury and those fears affected his decision with regards to calling and recalling witnesses."

Axelrod argued that a number of formal and informal accusations were made against him; and that his requests to obtain a transcript of the grand jury investigation and to bring the transcript before the trial court were refused. Axelrod also asserted that an assistant state's attorney indicated on the record that he was "a target of that investigation." (We are unable to locate this statement in the record.) Finally, Axelrod stated that although the director of his office indicated an indictment was unlikely, "[T]here were additional conversations * * * with the Assistant State's Attorney in which I had growing apprehensions * * *."

At this juncture, the trial court requested Axelrod to include those facts in a motion. Axelrod and Cohn both argued that due to the conflict of interest, another attorney should have been appointed to present the motion.

The next day, defense counsel presented a written motion to the court which alleged, *inter alia*, that: Dean accused counsel of bribing witnesses which influenced Axelrod's decision to recall Dean and call defendant as a witness. The trial court reviewed the fairness of the trial, concluded that no conflict existed, and denied the motion to substitute. Defense counsel then was ordered to prepare a motion for a new trial and the court on its own motion appointed additional counsel to argue that motion.

The State argues that these facts do not demonstrate that defense counsel's loyalty to defendant was divided. We agree. Axelrod did not become an adversary of defendant simply because Dean accused him of attempted bribery. Nor were his interests adverse to defendant's by virtue of Dean's hearsay representation that defendant told her Axelrod wanted her to perjure herself. Axelrod's vigorous, skillful and and highly professional defense of defendant indicates that he had no commitment to anyone but defendant. This is clearly shown in the record of this case. Further, defendant also was represented by another attorney from the Consortium, and his representation also was vigorous and able. *People v. Walton* (1979), 78 Ill. 2d 197, 399 N.E.2d 588.

Defendant argues that because of Axelrod's fears of further accusations, he did not recall Dean as a witness to testify to the fact that she was given immunity. Similarly, defendant asserts Axelrod did not call defendant as a witness because of these same fears. We believe these decisions were tactical in nature and part and parcel of defense counsel's defense strategy.

We also note that the record does not disclose that *defendant* accused counsel of suborning perjury. Thus, defendant's reliance on *People v. Brown* (1976), 40 Ill. App. 3d 562, 352 N.E.2d 15 is misplaced. There, prior to sentencing, defendant informed the court that his counsel conditioned his representation upon defendant's promise to perjure himself. Since defense counsel denied these accusations, his representation of defendant at the sentencing hearing, where he had to urge defendant's good character immediately after he denied defendant was a truth-teller, denied defendant effective assistance of counsel at the sentencing hearing. Thus, the cause was reversed and remanded for a new sentencing hearing, not a new trial.

Defense counsel was not placed in such a duplicitous situation since he did not represent *Dean*, but defendant. We do not believe the facts alleged by defendant and as disclosed in the record even give the appearance of a conflict of interest.

In conclusion, we point out and emphasize that those errors considered in this appeal and found to be individually harmless, even when viewed and considered cumulatively, are not of sufficient magnitude so as to result in depriving defendant of a fair trial. Compare *People v. Hudson* (1972), 7 Ill. App. 3d 333, 287 N.E.2d 297.

For the reasons stated, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

JOHNSON and ROMITI, JJ., concur.